Kellen S. Dwyer
(admitted *pro hac vice*)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, NW, Suite 643A
Washington, DC 20037
kdwyer@holtzmanvogel.com
Phone: (202) 737-8808

Bradley A. Benbrook
(CA Bar # 177786)
Stephen M. Duvernay
(CA Bar # 250957)
Benbrook Law Group, PC
701 University Ave., Suite 106
Sacramento, CA 95825
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com
Phone: (916) 447-4900
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP INC., a Delaware Corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>    Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>    Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT**<br><br>Judge: Hon. Phyllis J. Hamilton<br>Action Filed: 10/29/2019<br>Hearing: July 16, 2026, 1:30 p.m. (noticed date) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

    A.    The Underlying Lawsuit. ............................................................................... 3

    B.    The Permament Injunction. ........................................................................... 4

    C.    WhatsApp Deletes NSO's Chat Groups. ..................................................... 6

    D.    Summary of WhatsApp's Allegations and Purported Evidence. ................... 7

        1.    Allegation that NSO Created New WhatsApp Accounts. ..................... 7

        2.    Allegation that NSO Used Existing WhatsApp Accounts to Test "the Functionality of Its Spyware". .................................................................. 8

        3.    Allegation that NSO's Customers Texted "Malicious URLs" to Their Targets Via WhatsApp. ........................................................................... 9

LEGAL STANDARD ............................................................................................................. 11

ARGUMENT .......................................................................................................................... 12

    I.    WhatsApp Has Not Proven by Clear and Convincing Evidence that NSO Created WhatsApp Accounts After January 28, 2026. ................................... 12

    II.    The Injunction Does Not Bar NSO Employees from Using Pre-existing WhatsApp Accounts. ................................................................................... 14

    III.    WhatsApp Has Not Offered Clear and Convincing Evidence that NSO Is Using WhatsApp Groups To Test "The Functionaility of the Spyware" ................... 17

    IV.    WhatsApp Has Not Offered Clear and Convincing Evidence that NSO Has Provided URL's To Its Customers or that Its Customers Used Such URL's and In Any Case, The Injunction Does Not Prohibit Sovereign Governments from Using WhatsApp To Send URLs To Targets of Their Law Enforcement and Intelligence Operations. ................................................................................. 18

CONCLUSION ....................................................................................................................... 24

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

# TABLE OF AUTHORITIES

**Cases**

*Broidy Cap. Mgmt., LLC v. Qatar*,
982 F.3d 582 (9th Cir. 2020) ........................................................................................23

*Clark v. Coye*,
60 F.3d 600 (9th Cir. 1995) ..............................................................................12, 16, 20

*Colorado v. New Mexico*,
467 U.S. 310 (1984) ......................................................................................................11

*Eastwood v. Nat'l Enquirer*,
123 F.3d 1249 (9th Cir. 1997) .................................................................................11, 14

*Epic Games, Inc. v. Apple Inc.*,
161 F.4th 1162 (9th Cir. 2025) .....................................................................................15

*Hicks v. Feiock*,
485 U.S. 624 (1988) ......................................................................................................15

*In re Estate of Ferdinand Marcos Human Rights Litig.*,
94 F.3d 539 (9th Cir. 1996) ...........................................................................................23

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) .....................................................................................20

*Johnson Controls, Inc. v. Phx. Control Sys.*,
886 F.2d 1173 (9th Cir. 1989) .......................................................................................20

*Madsen v. Women's Health Center*,
512 U.S. 753 (1994) ......................................................................................................12

*Martin v. Jeppesen*,
466 F. Supp. 3d 1110 (D. Idaho 2020) ..........................................................................12

*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024) ......................................................................................12

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) ......................................................................................................20

*Mondaca-Vega v. Lynch*,
808 F.3d 413 (9th Cir. 2015) (en banc) ........................................................................11

*Reno Air Racing Ass'n v. McCord*,
452 F.3d 1126–34 (9th Cir. 2006) .................................................................................12

*Roe v. Critchfield*,

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

137 F.4th 912 (9th Cir. 2025) ........................................................................14, 15

*Shirazi v. Meta Platforms, Inc.*,
    3:26cv2615 (N.D. Cal. 2026) ..................................................................17, 18

*Soto v. County of Westchester*,
    No. 08-CV-5066, 2018 U.S. Dist. LEXIS 9822 (S.D.N.Y. Jan. 22, 2018) .........................11, 14

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ........................................................................13

*Stone v. City & County of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) ........................................................................11

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ........................................................................12

*United States v. Bollinger*,
    798 F.3d 201 (4th Cir. 2015) ........................................................................23

*United States v. Plummer*,
    941 F.2d 799 (9th Cir. 1991) ........................................................................16

*United States v. Underwood*,
    725 F.3d 1076 (9th Cir. 2013) ........................................................................11, 14

*United States v. Weaver*,
    99 F.3d 1372 (6th Cir. 1996) ........................................................................11, 14

*Wadler v. Bio-Rad Labs., Inc.*,
    916 F.3d 1176 (9th Cir. 2019) ........................................................................14

**Other**

*Attorney General Paxton Files Landmark Lawsuit Against Meta and WhatsApp for Lying About Privacy Measures and Deceiving Tex-ans by Falsely Claiming WhatsApp Messages are Encrypted* (May 21, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-files-landmark-lawsuit-against-meta-and-whatsapp-lying-about-privacy .....17, 18

CyberWire, "False Flag," https://thecyberwire.com/glossary/false-flag; Andy Greenberg, *Russian Hacker False Flags Work*, Wired (Feb. 27, 2018) ........................................................................13

Ivan Mehta, *WhatsApp now has more than 3 billion users a month*, TechCrunch (May 1, 2025), https://perma.cc/RUZ9-8GEF ........................................................................15

Recent Case, *Constitutional Law—Free Speech Clause—Sixth Circuit Classifies Computer Source Code as Protected Speech*, 114 Harv. L. Rev. 1813 (2001) ........................................................................20

Yinon Ben Shushan, *WhatsApp, YouTube, and Facebook: What are the most popular apps used in Israel in 2025?*, The Jerusalem Post (Oct. 26, 2025), https://www.jpost.com/business-and-innovation/article-871715 ........................................................................6, 15

**INTRODUCTION**

Plaintiffs' contempt motion based on alleged violations of the permanent injunction ("PI") uses a lot of technical-sounding words and circular phrases to obscure what are really very simple allegations based on little to no disclosed evidence.

*First*, Plaintiffs ("WhatsApp") allege that NSO Group Technologies Limited ("NSO") "created at least 23 new WhatsApp accounts" after the injunction went into effect. Mot. 3. But, incredibly, WhatsApp refuses to identify the alleged newly-created accounts, nor disclose the basis upon which WhatsApp determined that the accounts were created by NSO employees. All WhatsApp says it that its internal security team made that determination based on "technical and behavioral signatures that Meta has previously associated with NSO." Blaich Decl. ¶ 9. WhatsApp does not disclose what those "signatures" are or why WhatsApp believes they are associated with NSO. This is a far cry from "clear and convincing evidence."

*Second*, WhatsApp alleges that NSO is using pre-existing WhatsApp accounts to "create WhatsApp Groups to demonstrate, test, or confirm functionality of the spyware." *Id.* ¶ 10. The only disclosed evidence for this claim is that the names of the WhatsApp Groups in question contain the word "tests" (e.g., "Tests in Guinea 25.02.2026") and that one member of one of those groups shared a photo of a "desktop mat displaying the NSO Group logo." *Id.* ¶¶ 11–12. Even if a lone picture of a mousepad constituted clear and convincing evidence to attribute these groups to NSO, which it does not, those names do not remotely prove that the groups themselves are somehow being used to test "the functionality of the spyware." The more plausible inference is that the groups—like most WhatsApp Groups—are used to discuss things that happen outside of WhatsApp (e.g., tests that are occurring "in" another country). Nothing in the injunction prohibits NSO from using pre-existing WhatsApp accounts for discussions as the injunction only bars "*[c]reating* accounts . . . on the WhatsApp Platform." PI ¶ 3(d) (emphasis added).

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

*Third*, WhatsApp alleges without any supporting evidence that "an NSO customer . . . sent one-click malicious URLs using WhatsApp to a WhatsApp user." Mot. 4.  Importantly, WhatsApp does not allege that anyone transmitted Pegasus, or any other alleged "spyware," through WhatsApp servers or to WhatsApp client applications.  Rather, WhatsApp simply alleges that "an NSO customer"—not NSO—texted URLs to their targets via WhatsApp and that, if clicked, would cause the phone to download Pegasus from "a non-Meta, third-party website" without ever touching a WhatsApp server or client application.  Blaich Decl. ¶ 14.  Even if these allegations were true, the injunction does not cover the creation of "malicious URLs" that link to "non-Meta, third-party" websites because those URLs are not "technology," PI ¶ 3(a), or "computer code," PI ¶ 4, nor do they "interact[] with or emulate[]," PI ¶3(a), or "use, access, or depend on the WhatsApp Platform," PI ¶ 4.  Thus, even if WhatsApp could prove by clear and convincing evidence that an NSO customer texted such a URL over WhatsApp (which, again, it has not), such an independent decision by a foreign sovereign would not violate the injunction.  Indeed, there is no allegation that these URLs were somehow designed to be sent over WhatsApp, as opposed to any other means of communication.

What WhatsApp really wants is to impose on NSO customers (who are exclusively law enforcement and intelligence agencies of sovereign states) a de facto injunction and upon NSO an affirmative obligation to ensure that those customers do not use WhatsApp to text URLs to their targets—essentially an injunction on parties not before this Court. But such an attempt to control the tradecraft of foreign law enforcement and intelligence organizations, even when acting fully and lawfully within their own borders, would be unworkable and arguably unconstitutional.  That is why this Court went out of its way to specify that, "[n]otwithstanding anything herein," the injunction does not bind "Defendants' foreign sovereign customers." PI ¶ 1.

Case No. 4:19-cv-07123-PJH

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

Because WhatsApp seeks to rewrite rather than enforce the injunction, and because WhatsApp refuses to disclose the evidence allegedly supporting its allegations or otherwise provide anything approaching clear and convincing evidence, its motion should be denied.

**BACKGROUND**

**A.  The Underlying Lawsuit**

In October 2019, Plaintiffs sued NSO, alleging, as relevant here, that NSO violated the federal Computer Fraud and Abuse Act ("CFAA"), the California Comprehensive Data Access and Fraud Act ("CDAFA"), and WhatsApp's terms of service by licensing its product, Pegasus, to foreign law enforcement and intelligence agencies. Dkt. 1. Plaintiffs contended that NSO violated the CFAA and CDAFA by "exceed[ing] any purported authorized access" when its product "sen[t] [certain] types of messages" across WhatsApp's relay servers. Dkt. 465 at 19.  In particular, Plaintiffs alleged that NSO violated the CFAA and CDAFA by "reverse-engineer[ing] the WhatsApp app and develop[ing] a program that emulated legitimate WhatsApp network traffic in order to transmit malicious code [i.e., Pegasus] over WhatsApp servers." Order Granting in Part and Denying in Part Mot. to Dismiss, Dkt. 111, at 23 (citing Compl. ¶ 35). Plaintiffs further contended that NSO violated WhatsApp's terms of service (the "Terms") by reverse-engineering and decompiling WhatsApp's client application. Dkt. 465 at 8–11.

Following discovery, this Court granted WhatsApp's motion for partial summary judgment. Dkt. 494. As to the CFAA and CDAFA claims, the court found NSO was authorized to use WhatsApp servers to send WhatsApp messages, but "exceeded authorized access" to WhatsApp servers because Pegasus "obtain[ed] information about the target user's device *via* the WhatsApp servers." *Id.* at 12. As to the breach-of-contract claim, the court found NSO agreed to the Terms by creating WhatsApp accounts and breached those Terms by reverse-engineering or

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

decompiling the WhatsApp client to develop a program that emulates legitimate WhatsApp network traffic. *Id.* at 14.

### B. The Permanent Injunction

To prevent similar violations in the future, this Court entered a permanent injunction on November 11, 2025. Dkt. 809. The injunction, as relevant here, prohibits NSO—and expressly not its customers—from "[d]eveloping, using, selling, offering for sale, distributing, transferring, or licensing . . . any technology that interacts with or emulates any aspect of the WhatsApp Platform," PI ¶ 3(a), and from "creating accounts . . . on the WhatsApp Platform," PI ¶ 3(d). It also requires NSO to "delete and destroy any and all computer code or technologies that use, access, or depend on the WhatsApp Platform, including the WhatsApp Installation Server ('WIS') . . . and to disable customer access to any and all computer code or technologies maintained by the Prohibited Parties that use, access, or depend on the WhatsApp Platform." PI ¶ 4.

In its October 17, 2025, order responding to Plaintiffs' proposed injunction and NSO's objections, this Court refined the "scope" of the injunctive relief. Dkt. 802.

*First*, the Court went to painstaking lengths to clarify that the injunction was binding only on NSO and its employees. Responding to NSO's concern that Plaintiffs' proposed injunction would improperly apply to NSO's foreign sovereign customers (who were not parties to the suit because they cannot be sued due to their sovereign immunity), the Court directed Plaintiffs to "revise the proposed injunction to exclude defendants' foreign sovereign customers," *id.* at 14–15, and ultimately included the limiting provision "[n]otwithstanding anything herein, neither Defendants' foreign sovereign customers nor Defendants' outside counsel are Prohibited Parties" in the text of the injunction, PI ¶ 1. In doing so, the Court explained that "[b]ecause defendants' foreign sovereign customers are not before the court and have not been named as defendants, and because the court expressly ruled that they are not necessary parties, of course an injunction in this

case cannot apply to them." Dkt. 802 at 14 (noting that Plaintiffs themselves admitted that they were "not seeking injunctive relief against defendants' foreign sovereign customers" (quoting Dkt. 111 at 34)).

*Second*, while the Court rejected NSO's argument that federal courts cannot enjoin harmless, lawful activity, including the creation and use of WhatsApp accounts, it decided to only enjoin the former—at Plaintiff's urging. The Court found that Plaintiffs' first proposed injunction was too "confusing" because it contained "the word 'uses' multiple times,'" when referencing Plaintiffs' platform and ordered Plaintiffs to revise what would ultimately become ¶ 3(a) of the PI. *Id.* at 16–18. When Plaintiffs did so they deleted the prohibition on "using . . . Plaintiffs' Platforms" and added the current language that prohibits "using . . . any technology that interacts with or emulates any aspect of the WhatsApp Platform." Dkt. 803 Ex. 2, at 2. Plaintiffs chose to keep the relevant language of what became ¶ 3(d) of the PI the same—prohibiting NSO from "creating accounts," not from "using" accounts. *Id.* at 4.  Therefore, at Plaintiffs' request, the Court only "barr[ed] NSO from creating *new* accounts." Dkt. 558 at 24 (Plaintiffs motion for a permanent injunction) (emphasis added).

*Third*, the Court clarified that paragraph 4 simply "requires defendants to delete and destroy *computer code* related to plaintiffs' platforms." Dkt. 802 at 17 (emphasis added). The Court made no reference to deleting the WhatsApp client applications or disabling its customers' access to WhatsApp generally (which it has no ability to do).

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

## C. WhatsApp Deletes NSO's Chat Groups

Following the expiration of this Court's stay,[1] NSO began complying with the injunction. Yet, as noted above, nothing in the Permanent Injunction requires NSO employees to delete their existing WhatsApp accounts or refrain from using the platform to communicate (provided that those actions otherwise comply with the terms of the injunction). Nonetheless, in early June 2026, WhatsApp conducted an indiscriminate purge of any chat group on its platform that it believed was associated with NSO or its employees. This included the following groups:

- " שומרי מצוות ב nso" (translates to "Religiously Observant at NSO,"—a group for organizing daily prayer and other religious activities for company employees)
- "NSO ERT" (i.e., the Emergency Response Team—a group of NSO employees that are in charge of dealing with emergencies, such as fires, missile attacks, etc.)
- "NSO מגישי עזרה ראשונה" (translates to "NSO Emergency Medical Providers"—a group for employees with medical training to deal with medical emergencies in the company)
- "על גלגלים – NSO קייטנת" (translates to "NSO Camp on Wheels"—a group for organizing summer camp for NSO employees' kids)
- "Travel NSO" (i.e., a group for providing third party travel discounts to NSO employees for their private use)

As WhatsApp is well aware, its platform is the primary communication method in many non-U.S. countries, including and especially Israel. *See* Yinon Ben Shushan, *WhatsApp, YouTube, and Facebook: What are the most popular apps used in Israel in 2025?*, The Jerusalem Post (Oct. 26, 2025), https://www.jpost.com/business-and-innovation/article-871715 (noting that WhatsApp

---

[1] WhatsApp maintains that this Court's administrative stay expired "on January 28, 2026"—the date upon which the Ninth Circuit denied NSO's stay pending appeal. Mot. 1–2. But this Court did not tether the stay's expiration to the Ninth Circuit's decision. Instead, the Court ordered the stay to remain in place "for a period of up to 45 days" from the date of the order and directed NSO to "file a notice" in this Court "[w]ithin five (5) days of the Ninth Circuit's decision." Dkt. 824 at 9. Therefore, because there was no order to the contrary, the stay remained in place for the full 45 days, expiring on February 2, 2026 (which happened to fall five days after the Ninth Circuit's decision when NSO filed the required notice). At best, WhatsApp could interpret this Court's order as carrying an *implied* condition that the stay would expire if the Ninth Circuit denied NSO's motion. Nonetheless, because WhatsApp provided no evidence as to when NSO allegedly violated the injunction, it does not appear the discrepancy is material to this motion.

is "used by 99% of the Israeli population" among adults).  It likewise is well aware that NSO employees have had existing WhatsApp accounts for years in order to discuss both business and personal matters. WhatsApp's purge was an exercise of raw monopoly power with the predicable consequence of cutting off NSO employees' access to critical communication channels for reasons unrelated to the terms of the permanent injunction.

**D.  Summary of WhatsApp's Allegations and Purported Evidence**

On June 8, 2026, WhatsApp filed the instant motion for contempt, alleging that "NSO has engaged in two categories of conduct that the injunction prohibits: *First*, NSO created and operated accounts on the WhatsApp platform, using them for 'testing.'  *Second*, NSO used WhatsApp to send one-click malicious URL links to targeted WhatsApp users."  Mot. 2.  For these claims, WhatsApp relies entirely on a single declaration from Andrew Blaich, WhatsApp's own "Security Engineer Investigator." Blaich Decl. ¶ 2. This declaration, however, provides almost no evidence to support these claims and often contradicts them.

**1.     *Allegation that NSO Created New WhatsApp Accounts.*** WhatsApp alleges that "NSO created at least 23 new WhatsApp accounts" after the permanent injunction went into effect. Mot. 3. But WhatsApp never identifies these accounts in any way, shape, or form.  And the only "evidence" that NSO created these unidentified accounts is Mr. Blaich's extraordinarily vague assertion that "[t]hese WhatsApp accounts and WhatsApp Groups share technical and behavioral signatures that Meta has previously associated with NSO testing, including account registration patterns, device and other related information, and connections to known NSO-controlled infrastructure." Blaich Decl. ¶ 9.

Thus, Mr. Blaich's "proof" is as follows: (1) WhatsApp previously decided that certain other WhatsApp accounts were associated with NSO, but WhatsApp will not say what those accounts are or why WhatsApp previously decided they were linked to NSO; (2) those previous

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

WhatsApp accounts have certain "technical and behavioral signatures" that WhatsApp will not share with NSO or the Court; but (3) Mr. Blaich nonetheless promises that the undisclosed "technical and behavioral signatures" from the old WhatsApp accounts are sufficiently close to the "technical and behavioral signatures" associated with some newly-created WhatsApp accounts to satisfy Mr. Blaich that the new WhatsApp accounts must also have been created by NSO.

**2.    *Allegation that NSO Used Existing WhatsApp Accounts To Test "the Functionality of Its Spyware."*** WhatsApp also alleges that NSO has used existing WhatsApp accounts for "testing." Mot. 2. Specifically, Mr. Blaich asserts that NSO "create[d] WhatsApp Groups to demonstrate, test, or confirm functionality of the spyware." Blaich Decl. ¶ 10. Mr. Blaich's support for this claim is characteristically vague. He asserts that "the Threat Intelligence team has identified over 20 [WhatsApp Groups] as 'testing groups'—groups bearing the signals described above—associated with NSO testing activity across at least 13 different countries." *Id.* But Blaich never identifies what those "signals" are, how they are attributable to NSO, or why they reliably indicate that NSO is using WhatsApp accounts to test Pegasus. Rather, the "signals described above" refers to Blaich's conclusory and circular claim that WhatsApp's "Threat Intelligence team uses the term 'testing' or 'testing accounts' to describe accounts and activity that bear signals the Threat Intelligence team associates with NSO testing its spyware accounts NSO uses to determine whether aspects of its spyware are functioning properly." *Id.* ¶ 8. Translation: WhatsApp's internal investigators have identified certain "signals" that they believe reliably indicates that NSO is using WhatsApp accounts to test its products, but WhatsApp will not disclose what those signals are or explain why those "signals" reliability indicate that NSO is using WhatsApp accounts to test its products. Mr. Blaich does add that those "signals" are "a combination of account level and behavioral signals," and that the "Threat Intelligence Team

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

conducts further investigation," where necessary. *Id.* But he does not disclose whether "further investigation" was conducted in this case or, if so, what it showed.

Mr. Blaich claims that this entirely conclusory evidence "is corroborated" by the names of the alleged "testing groups," which were "tilted in a consistent 'Tests in [location] [date]'—for example, 'Tests in Guinea 25.02.2026.'" *Id.* ¶ 11. Mr. Blaich further claims that a member of an alleged NSO "testing group" reported the group to WhatsApp and included a photograph that a member of the group allegedly shared within the group that "depicts a desktop mat displaying the NSO Group logo." *Id.* ¶ 12. Mr. Blaich provides no further details about the desktop mat that would attribute it to NSO or its employees. Mr. Blaich also does not disclose what other messages or metadata, if any, were forwarded to WhatsApp when this alleged NSO insider submitted a report. Nor does he identify any other information WhatsApp gleaned when it reviewed this alleged insider's report. Moreover, because WhatsApp's reporting feature does not allow a user to include additional details in its report, it does not appear that the insider's report contained any information about what the alleged "testing group" was being used for, or that the report provided anything to support Mr. Blaich's allegation that NSO employees were using WhatsApp groups "to demonstrate, test, or confirm functionality of the spyware." *Id.* ¶ 10.

**3.      *Allegation that NSO's Customers Texted "Malicious URLs" To Their Targets Via WhatsApp.*** WhatsApp provides no evidence for its claim that "*NSO* used WhatsApp to send one-click malicious URL links to targeted WhatsApp users." Mot. 2 (emphasis added). Indeed, WhatsApp appears to change that allegation later, alleging instead that "an NSO *customer . . .* sent one-click malicious URLs using WhatsApp to a WhatsApp user." *Id*. at 4 (emphasis added). Mr. Blaich likewise vacillates between alleging that a "WhatsApp account *associated with NSO* sent malicious URLs," Blaich Decl. ¶ 16 (emphasis added), and alleging the "malicious links" were part of "campaigns by the same NSO *customer*," *id.* ¶ 18(c) & (e) (emphasis added). In any event,

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

Mr. Blaich offers no evidence that NSO itself sent any malicious URLs. His only evidence is that the URLs contains a domain name ("*cast[.]com") that WhatsApp's "Threat Intelligence team confirmed in a pre-injunction campaign by the same [NSO] customer." *Id.* ¶ 18(e). It is not clear how WhatsApp "confirmed" that a NSO customer had previously used the "cast[.]com" domain, nor does WhatsApp give any reason to believe that *only* NSO customers use that domain. But, in any event, this certainly does not prove that NSO itself, as opposed to its customer, sent the URL via WhatsApp.

WhatsApp also contradicts itself as to whether the "malicious URLs" were sent to targets via WhatsApp or via a separate "NSO-operated delivery infrastructure." WhatsApp's brief alleges "NSO used WhatsApp to send one-click malicious URL links to targeted WhatsApp users." Mot. 2. Mr. Blaich, by contrast, swears that "[t]he infrastructure used to deliver the February 2026 and April 2026 malicious URLs is, based on the Threat Intelligence team's analysis, infrastructure that NSO continues to operate." Blaich Decl. ¶ 19. Even this is contradicted by Mr. Blaich's earlier claim, made with "high confidence," that the campaigns "us[ed] the WhatsApp Platform to deliver likely one-click malicious URLs to targeted individuals." *Id.* ¶ 13.

Taking it all together, the most coherent reading of WhatsApp's unsubstantiated allegations is that an NSO customer or customers used WhatsApp to send URLs to targets of their law enforcement or intelligence operations which, if clicked, would cause the target's phones to download Pegasus from a remote server. Importantly, WhatsApp concedes that clicking of the "malicious URLs"—even one delivered via WhatsApp—does not cause Pegasus to be delivered to the target through WhatsApp servers or WhatsApp client applications. Rather, Mr. Blaich admits that "[a]ttacker activity as it applies here does not involve exploiting WhatsApp but rather involves sending a targeted user a malicious URL link for a non-Meta, third-party website that will attempt to cause malware to download and install on the target device if the recipient clicks on the

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

malicious URL." *Id.* ¶ 14. Thus, WhatsApp's repeated use of the nefarious-sounding and circumstantial term "NSO-operated delivery infrastructure" does not refer to any vector that delivers Pegasus to targets via WhatsApp; it refers to a non-WhatsApp related delivery method that is triggered when a target clicks on phishing email or text that can be sent to the target using any and all means of text-based communication that exist.

## LEGAL STANDARD

To enforce an injunction through civil contempt, the moving party must demonstrate "by clear and convincing evidence that the [enjoined party] violated a specific and definite order of the court." *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). The "clear and convincing" standard requires the moving party to present evidence sufficient to establish "'an abiding conviction that the truth of [the] factual contentions at issue is highly probable.'" *Mondaca-Vega v. Lynch*, 808 F.3d 413, 422 (9th Cir. 2015) (en banc) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). This is a formidable burden—one that is "far in excess of the preponderance sufficient for most civil litigation." *Eastwood v. Nat'l Enquirer*, 123 F.3d 1249, 1252 (9th Cir. 1997). Consequently, "[c]onclusory allegations" that fail to supply the underlying factual basis "are insufficient to satisfy the clear and convincing evidence standard." *Soto v. County of Westchester*, No. 08-CV-5066, 2018 U.S. Dist. LEXIS 9822, at *10 (S.D.N.Y. Jan. 22, 2018); *cf. United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996) (affidavits that "state[] suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge" fail to clear the much lower probable cause standard); *United States v. Underwood*, 725 F.3d 1076, 1082 (9th Cir. 2013) (affidavits that do not "recite underlying facts so that the [ ] judge can draw his or her own reasonable inferences and conclusions" "cannot be used to establish probable cause").

While "the language of the injunction itself" is the primary guide to discerning "the scope of an injunction," *Martin v. Jeppesen*, 466 F. Supp. 3d 1110, 1116 (D. Idaho 2020), injunctions are interpreted in "light of the circumstances surrounding the order's entry," including "the litigation history" (i.e., the accompanying opinion, previous orders, briefs, etc.) as well as the underlying legal wrong the injunction was meant to remedy. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1133–34 (9th Cir. 2006) (cleaned up); *Melendres v. Skinner*, 113 F.4th 1126, 1138 (9th Cir. 2024) (interpreting district court's injunction in light of previous orders and "the [district] court's exchanges . . . at a status conference before the issuance of the" injunction). Further, because courts are assumed to stay within their equitable powers, injunctions should be read to avoid constitutional problems that would emerge if the injunction was read broadly. *See Madsen v. Women's Health Center*, 512 U.S. 753, 808–09 (1994) (Scalia, J., concurring in judgment in part and dissenting in part). Finally, to ensure "that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt," *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (cleaned up), "all ambiguities are resolved in favor of the person subject to the injunction," *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) (citation omitted).

## ARGUMENT

### I. WhatsApp Has Not Proven by Clear and Convincing Evidence that NSO Created WhatsApp Accounts After January 28, 2026

WhatsApp alleges that "NSO created at least 23 new WhatsApp accounts" after the permanent injunction went into effect, Mot. 3, in violation of Paragraph 4(d) of the Permanent Injunction." PI ¶ 4(d). But WhatsApp has not provided anything to identify these accounts.  It has not, for instance, provided the account names, the phone numbers associated with the accounts, or any other identifying information that could possibly allow NSO to determine whether or not the accounts were created by its employees. This does not even satisfy the minimal requirements for

notice pleading, much less the demanding requirement of clear and convincing evidence. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (explaining at the pleading stage that a complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"). That itself is sufficient to deny WhatsApp's motion for contempt as to the alleged newly created accounts.

Since WhatsApp has not even identified the alleged newly-created accounts, it certainly has not proven that NSO created those accounts by clear and convincing evidence. WhatsApp simply offers the bald assertion that "[t]hese WhatsApp accounts . . . share technical and behavioral signatures that Meta has previously associated with NSO testing, including account registration patterns, device and other related information, and connections to known NSO-controlled infrastructure." Blaich Decl. ¶ 9. WhatsApp does not say what the "technical and behavioral signatures" are, how WhatsApp previously associated those "technical and behavioral signatures" with NSO, why WhatsApp is confident that it *correctly* associated those "technical and behavioral signatures" with NSO activity, why those signatures are unique to NSO and cannot be emulated by others,[2] or how WhatsApp was able to determine that the "signatures" associated with the prior alleged NSO accounts are sufficiently similar to "signatures" associated with the current alleged NSO accounts so as to reliably conclude that the two sets of WhatsApp accounts were created by the same actor.

---

[2] Intelligence agencies are known to plant "false flags" in order to deceive even sophisticated defenders into mis-attributing their activities to other known actors in the space. *See* CyberWire, "False Flag," https://thecyberwire.com/glossary/false-flag; Andy Greenberg, *Russian Hacker False Flags Work*, Wired (Feb. 27, 2018) ("False flags, for the modern nation-state hacker, are quickly becoming as standard a part of the toolkit as phishing links."). Given the notoriety NSO has received, it would not be at all surprising for an intelligence agency, or an NSO competitor, to plant "false flags" aimed at deflecting blame towards NSO. Indeed, NSO has many competitors—*e.g.*, Paragon, Blue Ocean, DataFlow—who would love nothing more than to disguise their operations while creating more legal problems for NSO.

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

Rather, the Court is asked to simply accept Mr. Blaich's assurance that he has looked at WhatsApp's undisclosed internal evidence and concluded, "with high confidence," that NSO created new WhatsApp accounts in violation of the Court's injunction. This sort of unadorned "trust me" evidence would not satisfy any evidentiary standard, much less the exacting clear and convincing standard, which is "far in excess of the preponderance sufficient for most civil litigation." *Eastwood*, 123 F.3d at 1252. Indeed, even if the Court were applying the far lower probable cause standard, it would not be remotely sufficient for an FBI agent to simply assure the Court that a target account "share[s] technical and behavioral signatures that [FBI] has previously associated with" a defendant. Blaich Decl. ¶ 9; *see Underwood*, 725 F.3d at 1082 (affidavits that do not "recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions . . . cannot be used to establish probable cause"). Certainly, "[c]onclusory allegations" that fail to supply the underlying factual basis "are insufficient to satisfy the clear and convincing evidence standard." *Soto*, 2018 U.S. Dist. LEXIS 9822, at *10; *accord Weaver*, 99 F.3d at 1378.

## II.    The Injunction Does Not Bar NSO Employees from Using Pre-existing WhatsApp Accounts

The injunction bars NSO from "*[c]reating* accounts . . . on the WhatsApp Platform." PI ¶ 3(d) (emphasis added). The omission of any requirement that NSO delete its existing WhatsApp accounts, or not "use" or "operate" WhatsApp accounts, is glaring, especially when compared to neighboring provisions of the injunction that use multiple verbs to convey breadth. *See e.g.*, PI ¶ 3(a) (barring NSO from "developing, using, selling, offering for sale, distributing, transferring, or licensing" certain technology). The strong implication is that the injunction permits the use of existing WhatsApp accounts, so long as NSO did not create new ones. *See Roe v. Critchfield*, 137 F.4th 912, 930 n.15 (9th Cir. 2025) ("The doctrine of *expressio unius est exclusio alterius . . .*

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." (cleaned up)); *Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019) (explaining that drafters act intentionally when they "use[] particular wording in one part of a statue but omit[] it in another" and providing the example that "when a statute uses the phrase 'law, rule, or regulation' in one section but uses only 'law' in a different section, the word 'law' does not encompass administrative rules or regulations").

Barring NSO employees from using pre-existing WhatsApp accounts for any purpose would significantly broaden the already-broad injunction and would amount to a punitive sanction on NSO's business that has little relation to underlying alleged illegal conduct. *See Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1185 (9th Cir. 2025) (explaining that civil contempt sanctions for violations of injunctions cannot be "punitive"); *Hicks v. Feiock*, 485 U.S. 624, 632–33 (1988). WhatsApp has 3.3 billion users worldwide and is particularly popular overseas, where it has essentially monopolized the market for text messaging applications. *See* Ivan Mehta, *WhatsApp now has more than 3 billion users a month*, TechCrunch (May 1, 2025), https://perma.cc/RUZ9-8GEF; Dkt.749 at 325:7–12. WhatsApp is particularly popular in Israel, where it is used by an astounding 99% of the adult population. *See* Yinon Ben Shushan, *WhatsApp, YouTube, and Facebook: What are the most popular apps used in Israel in 2025?*, The Jerusalem Post (Oct. 26, 2025), https://www.jpost.com/business-and-innovation/article-871715 (summarizing results of the Israel Internet Association's annual report). Perhaps that is why WhatsApp did not even propose banning NSO from using WhatsApp accounts when it revised its proposed permanent injunction. *See* Dkt. 803 Ex. 2; Plaintiffs' Mot. for Permanent Injunction, Dkt. 558 at 24 (only requesting that the Court "bar[] NSO from creating *new* accounts" when discussing what became ¶ 3(d) of the PI (emphasis added)).

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

Even though WhatsApp ultimately did not ask this Court to ban NSO from continuing to use pre-existing WhatsApp accounts, it now tries to achieve that result by creatively reinterpreting Section 3(a) of the injunction. That provision prohibits NSO from "[d]eveloping, using, selling, offering for sale, distributing, transferring, or licensing . . . any technology that interacts with . . . the WhatsApp Platform," PI ¶ 3(a). WhatsApp would read Section 3(a) to bar NSO from using the WhatsApp Platform at all because using the WhatsApp Platform "necessarily involves using technology that interacts with the Platform." Mot. 5–6. Nonsense. The WhatsApp platform does not "interact with" itself. And if the Court wished to bar NSO employees from using WhatsApp for any purpose, it would have just said so (presumably in Section 3(d)).[3] What Section 3(a) prohibits is developing, using, or distributing a distinct, *non-WhatsApp* "technology that interacts with the WhatsApp Platform." Using a WhatsApp client application to send WhatsApp messages does not constitute using a distinct "technology that interacts with the WhatsApp Platform," PI ¶ 3(a); rather, the Court explicitly defined "the WhatsApp Platform" to include WhatsApp client applications, PI ¶ 2.

Finally, to the extent this is a close call, "all ambiguities are resolved in favor of the person subject to the injunction," *Clark*, 60 F.3d at 604, especially since WhatsApp originally drafted the language in question, *see United States v. Plummer*, 941 F.2d 799, 804 (9th Cir. 1991) (noting that ordinary contract principles dictate that "ambiguity will be resolved against the one who drafted the language").

---

[3] Indeed, WhatsApp originally did propose barring NSO from "using . . . Plaintiffs' Platforms" but, after the Court refused, WhatsApp narrowed its proposed injunction to the current language that prohibits "using . . . any technology that interacts with or emulates any aspect of the WhatsApp Platform." Dkt. 803 Ex. 2, at 2.

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

**III.   WhatsApp Has Not Offered Clear and Convincing Evidence that NSO Is Using WhatsApp Groups To Test "The Functionality of the Spyware"**

Mr. Blaich further alleges that NSO is using WhatsApp accounts to "create WhatsApp Groups to demonstrate, test, or confirm functionality of the spyware." Blaich Decl. ¶ 10. Besides the conclusory allegation that these "groups bear[] the [undisclosed] signals . . . associated with NSO testing activity," *id.*, WhatsApp's only evidence for this incendiary claim is the names of the groups in question and a report of a member of one of the alleged "testing" groups. But the fact that a WhatsApp group is named "Tests in Guinea 25.02.2026," *id.* ¶ 11, does not remotely prove that the Group itself is either associated with NSO or is somehow being used to test the ability to deliver Pegasus to targets via the WhatsApp platform. "Tests in Guinea," even assuming it was an NSO-created group, could just be a group for *discussing* the logistics of tests for products that take place off the WhatsApp Platform. In any event, WhatsApp provides no evidence as to what "testing" is allegedly occurring in the WhatsApp group or how it violates the PI.

Nor does WhatsApp's alleged insider's report prove attribution to NSO or support its claim that NSO was using WhatsApp groups to test "functionality of the spyware." Indeed, if WhatsApp really has access to a member of those alleged "testing groups,"[4] that person would presumably

_____

[4] If WhatsApp is instead gaining access to the substance of these alleged "testing groups" unilaterally, that would conflict with representations WhatsApp has made publicly and to this Court regarding its End-to-End Encryption. Indeed, the injunction was issued in part upon WhatsApp's representations regarding the importance of maintaining end-to-end encryption. *See* Dkt. 802 (granting PI in part because WhatsApp "tout[ed] end-to-end encryption as a feature for users to protect their privacy" which "would be significantly harmed if that feature was rendered ineffective"). Since the injunction was issued, however, multiple lawsuits have been filed alleging that WhatsApp can access user messages using a backdoor in the application's source code (for instance via the decryptioncallbackv2 code) that allows the platform to circumvent encryption through a callback function that decrypts users' data, notwithstanding its public claims to the contrary. *See Shirazi v. Meta Platforms, Inc.*, 3:26cv2615 (N.D. Cal. 2026), Dkt. 1; Press Release, *Attorney General Paxton Files Landmark Lawsuit Against Meta and WhatsApp for Lying About Privacy Measures and Deceiving Tex-ans by Falsely Claiming WhatsApp Messages are Encrypted* (May 21, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-files-landmark-lawsuit-against-meta-and-whatsapp-lying-about-privacy (alleging that WhatsApp

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

be able to confirm that the group was in fact being used to "demonstrate, test, or confirm functionality of the spyware." *Id.* ¶ 10. Yet WhatsApp does not provide this insider's account in a declaration or in any other form.[5]  Instead, the only information this insider's report apparently contained was a photo of a "desktop mat displaying the NSO Group logo," *id.* ¶ 12, that was supposedly shared by a member of the group.  Even assuming the mat did not belong to a *former* NSO employee, a family member, or a competitor impersonating an NSO employee, this report would, at most, suggest that an NSO employee was using a pre-existing WhatsApp account to discuss some "testing" of some product that was taking place outside of WhatsApp.  Even if true, that conduct would not violate the Permanent Injunction.

IV.    **WhatsApp Has Not Offered Clear and Convincing Evidence that NSO Has Provided URL's To Its Customers or that Its Customers Used Such URL's and, in any Case, the Injunction Does Not Prohibit Sovereign Governments from Using WhatsApp To Send URLs To Targets of Their Law Enforcement and Intelligence Operations**

WhatsApp appears to allege that NSO provides URLs to its client which, if clicked, would cause the target phone to download Pegasus from "a non-Meta, third-party website" without Pegasus ever touching a WhatsApp server or client application.  *Id.* ¶ 14.  WhatsApp alleges that "an NSO customer" then sent these "malicious URLs using WhatsApp to a WhatsApp user." Mot. 4.  As noted above, the only "evidence" that the URL was sent by an NSO customer is that the

---

has long maintained the ability to obtain user communications despite longstanding assertions to the contrary). In particular, these lawsuits allege that "Former Meta contractors reported to special agents with the U.S. Department of Commerce's Bureau of Industry and Security that 'they and some of their colleagues had broad access to the substance of WhatsApp messages that were supposed to be encrypted and inaccessible.'" *Shirazi*, 3:26cv2615, Dkt. 1, ¶ 60.

[5] Mr. Blaich states that, "[w]hen a user submits a report to WhatsApp, the user shares up to five of the last messages that the reported user sent to the reporting user." Blaich Decl. ¶ 6. Yet WhatsApp has not disclosed any messages from the alleged insider that could give any context into what alleged wrongdoing, if any, the insider reported.  Rather, WhatsApp simply submitted a photograph of what appears to be a cup of soup. *See* Blaich Decl. Ex. A.

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

URL "shares a distinctive *cast[.]com naming convention" that WhatsApp says has been used by an NSO customer in the past. Blaich Decl. ¶ 18(e). But there is no information about what this *cast[.]com is or how easy it would be for another actor to use or emulate. Again, "false flags" are commonplace, *see supra* note 2, and if WhatsApp knows that *cast[.]com is "distinctive" to an NSO customer, an NSO competitor or a nation-state intelligence agency would surely know that as well.

In any event, even if an NSO customer did send a URL to its target via WhatsApp, that would not violate the Permanent Injunction because the only nexus to WhatsApp is an independent decision by NSO customers to text URLs to their targets via WhatsApp (when the customer could use any means of communication to transmit the URLs) and this Court explicitly exempted NSO's customers from the injunction. *See* PI ¶ 1.

WhatsApp seeks to avoid this clear limitation and nonetheless control the actions of foreign intelligence agencies by arguing that NSO violated Section 3(a) of the Permanent Injection by allegedly providing the URLs to its clients. But Section 3(a) is limited to the development, use, or distribution of "any technology that interacts with or emulates any aspect of the WhatsApp Platform." PI ¶ 3(a); Mot. 3. URLs are not "technology" any more than phone numbers or email addresses are "technology"; all three are simply addresses. Moreover, URLs do not "emulate" or "interact with" the WhatsApp Platform simply because they could, like any other piece of text, be sent through WhatsApp. Specifically, there is no allegation that the URLs purported to be WhatsApp-generated, or caused any sort of reaction from the WhatsApp servers beyond being delivered to their intended recipient like any other piece of text. Rather, Section 3(a) was clearly written to cover materials like the underlying allegations in the complaint: selling technology, such as alleged "spyware," that was designed to be delivered through WhatsApp servers while emulating normal WhatsApp traffic. *See* Dkt. 111, at 23. And, again, to the extent the injunction

19                         Case No. 4:19-cv-07123-PJH

is at all ambiguous on this point, that ambiguity must be resolved in favor of NSO. *See Clark*, 60 F.3d at 604.

For the same reasons, simply providing URLs to clients does not violate Section 4 of the injunction, which is similarly limited to "computer code or technologies that use, access, or depend on the WhatsApp Platform." PI ¶ 4. Just as a URL is not "technology," nor is it "computer code." Computer "code" is a "set of instructions . . . that directs a computer to perform specified functions or operations." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 447 (2007); Recent Case, *Constitutional Law—Free Speech Clause—Sixth Circuit Classifies Computer Source Code as Protected Speech*, 114 Harv. L. Rev. 1813, 1813 n.1 (2001); *see Johnson Controls, Inc. v. Phx. Control Sys.*, 886 F.2d 1173, 1175 n.2 (9th Cir. 1989) (computer code consists of "source code," which is "a set of instructions to the computer, in [programing] languages such as BASIC, or FORTRAN" and "object code," which "is the same set of instructions, but in binary code, a series of 1's and 0's, which the computer reads"). Unlike code, a URL is not a "set of instructions," it does not instruct the computer to perform operations, and it certainly is not written in a programing language or in binary code. It is simply data: an identifier or address that software can read and use. *Cf. Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1376-77 (Fed. Cir. 2014) ("The distinction between program (instructions) and data is a fundamental one in computing." (quoting *Oxford Dictionary of Computing*)).

Perhaps recognizing the absurdity of claiming that a URL is a "technology" or "computer code," WhatsApp never even argues that point. Instead, it claims that "an NSO customer used NSO-operated delivery infrastructure to send one-click malicious URLs to targets through WhatsApp" and "*[t]hat infrastructure* is technology that interacts with the WhatsApp Platform," in violation of the Section 3(a) of the injunction. Mot. 6 (emphasis added). What? The allegation that NSO customers used "NSO-operated delivery infrastructure" to send the URLs to their clients

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

is flatly inconsistent with the allegation—in the same sentence, no less—that the NSO customers sent the "URLs to targets through WhatsApp." *See also id.* at 2 ("NSO used WhatsApp to send one-click malicious URL links to targeted WhatsApp users."); Blaich Decl. ¶ 13 (NSO or its customers "us[ed] the WhatsApp Platform to deliver likely one-click malicious URLs to targeted individuals").[6] It is entirely unclear how one would use "NSO-operated delivery infrastructure" to text a URL via WhatsApp, or why one would want or need to use any "technology" to simply text a URL to a target via WhatsApp. Nor is there any evidence of how the alleged "NSO-operated delivery infrastructure," whatever that means, "interacts with the WhatsApp Platform." Mot. 6. To the contrary, the only thing Mr. Blaich discusses that could plausibly be termed "NSO-operated delivery infrastructure" is what happens *after* a target receives and clicks on a URL, and that is that Pegasus is downloaded from "a non-Meta, third-party website" without ever touching or passing through any WhatsApp server or application. *See* Blaich Decl. ¶ 14. WhatsApp's reference to "the trial record" showing that "[t]he 2019 attack vectors" involved Pegasus being "transmitted through WhatsApp servers," Mot. 7, is irrelevant given that WhatsApp's 2026 allegation is that

---

[6] In any event, if it were true that the "malicious URLs" were delivered to targets via "infrastructure that NSO continues to operate," rather than via WhatsApp, that would further undermine the argument that the injunction was violated because, in the absence of a nexus to WhatsApp, there would be nothing that prohibits NSO's clients from using NSO's infrastructure to communicate with targets outside the United States.

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

Pegasus is downloaded from "a non-Meta, third-party website," Blaich Decl. ¶ 14.[7]

All of this convoluted argumentation is designed to obscure what WhatsApp is really asking the Court to do: regulate the tradecraft of foreign intelligence and law enforcement agencies. For WhatsApp, it is not enough for Pegasus to be stored on "non-Meta, third-party websites" and for NSO to ensure that Pegasus is not delivered through WhatsApp servers. WhatsApp wants the Court to impose an affirmative obligation on NSO to somehow ensure that its sovereign government clients do not use WhatsApp messages in order to trick their targets into downloading Pegasus from those third-party websites. WhatsApp does not even try to explain how that would work. NSO does not have the technical ability to prevent particular URLs from being sent over WhatsApp. Nor, it appears, does WhatsApp. According to Mr. Blaich, WhatsApp has long been aware of "distinctive" third-party domains that are used to deliver Pegasus. *Id.* ¶¶ 15, 18(e). If it were possible to simply block URLs containing those domains from being texted via WhatsApp, presumably WhatsApp would have done so already.

---

[7] Contrary to WhatsApp's assertion, Mot. 9, NSO's "prior testimony that NSO no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp servers, or WhatsApp client applications remains accurate." Dkt. No. 813, Shohat Decl. ¶ 46. Again, WhatsApp does not allege that Pegasus is transmitted through WhatsApp servers or applications to reach target devices; to the contrary, WhatsApp admits that Pegasus must be downloaded from "non-Meta, third-party websites." Blaich Decl. ¶ 14. And WhatsApp certainly does not allege NSO is aware of any WhatsApp vulnerabilities or exploits that could enable Pegasus to be surreptitiously installed on target phones via WhatsApp; to the contrary, WhatsApp concedes that "Attacker activity as it applies here does not involve exploiting WhatsApp." *Id.* The mere fact that a URL that links to a third party containing Pegasus could, in theory, be sent to target phones via any communications mechanism that exists, including WhatsApp, does not mean that NSO has "installation vectors" for WhatsApp. If it did, that would mean that NSO also has "installation vectors" for Signal, Telegram, Gmail, TikTok, and every other application that provides a communications function since, in theory, third parties could send "malicious URLs" over those platforms as well. Indeed, an NSO customer could write a physical letter requesting that the target visit the URL and mail it to the target. But that would not mean that NSO has developed an "installation vector" for the Postal Service.

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

Rather, it appears that WhatsApp seeks to require NSO to instruct its sovereign clients that they cannot use WhatsApp to send their targets URLs that link to servers that house Pegasus. This would, in turn, require foreign law enforcement and intelligence agencies to train their uncover agents—and private human sources—to avoid using WhatsApp at critical stages of sensitive operations. For instance, if a foreign undercover agent or confidential source, in accordance with that country's laws, is texting with a suspected terrorist over WhatsApp, and reaches a level of trust where the agent or the source believes the target might click a URL that the agent or source sends, WhatsApp would read the Court's injunction to require the agent or source to migrate the conversation to a different application before sending the URL—a move that is quite likely to arouse suspicion.

This would be an extremely intrusive and unworkable requirement, which is precisely why the Court went out of its way to specify that "[n]otwithstanding anything herein," nothing in the injunction should be read to impose obligations on "Defendants' foreign sovereign customers." PI ¶ 1. As the Court correctly acknowledged, extending the already-broad injunction to dictate the particular tradecraft that foreign law enforcement and intelligence agencies may use when attempting to collect intelligence from national security targets located outside the United States in full compliance with that country's laws, would raise serious practical, constitutional, and statutory problems. *See Broidy Cap. Mgmt., LLC v. Qatar*, 982 F.3d 582, 595 (9th Cir. 2020) (noting that "collect[ing] foreign intelligence" through surveillance technology is "the sort of peculiarly sovereign conduct that all national governments (including our own) assert the distinctive power to perform" (quotation omitted)); *In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 548 (9th Cir. 1996) (abuse of discretion to attempt to enjoin foreign sovereign); *United States v. Bollinger*, 798 F.3d 201, 212–16 (4th Cir. 2015) (noting that the

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT

Foreign Commerce clause limits Congress's power to regulate fully-foreign conduct, especially where other states have a stronger interest in regulating the conduct).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' contempt motion.

Dated: June 22, 2026                                        Respectfully submitted,

                                                        HOLTZMAN    VOGEL    BARAN
                                                        TORCHINSKY & JOSEFIAK PLLC


                                                        By: _/s/ Kellen S. Dwyer_____

                                                        Kellen S. Dwyer
                                                        (admitted *pro hac vice*)
                                                        HOLTZMAN VOGEL BARAN
                                                        TORCHINSKY & JOSEFIAK PLLC
                                                        2300 N Street, NW, Suite 643A
                                                        Washington, DC 20037
                                                        kdwyer@holtzmanvogel.com
                                                        Phone: (202) 737-8808

                                                        Bradley A. Benbrook
                                                        Stephen M. Duvernay
                                                        Benbrook Law Group, PC
                                                        701 University Ave., Suite 106
                                                        Sacramento, CA 95825
                                                        brad@benbrooklawgroup.com
                                                        steve@benbrooklawgroup.com
                                                        Phone: (916) 447-4900

                                                        *Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT