Greg D. Andres
Antonio J. Perez-Marques
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:    greg.andres@davispolk.com
          antonio.perez@davispolk.com
          luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:    micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP LLC and<br>META PLATFORMS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED<br>and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT**<br><br>Date:    July 16, 2026<br>Time:    1:30 pm<br>Ctrm:    3<br>Judge:  Hon. Phyllis J. Hamilton<br>Action Filed: October 29, 2019 |

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ..............................................................................................................................1

ARGUMENT .....................................................................................................................................2

I.      NSO Violated the Injunction By Creating WhatsApp Accounts ............................................2

II.    NSO Violated the Injunction By Operating WhatsApp Accounts ..........................................5

III.   NSO Violated the Injunction By Deploying One-Click Malicious URLs Through the WhatsApp Platform .............................................................................................................8

CONCLUSION ................................................................................................................................13

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT - CASE NO. 4:19-CV-07123-PJH

# TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE</small>(S)

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) .................................................................................... 12

*Epic Games, Inc. v. Apple Inc.*,
   161 F.4th 1162 (9th Cir. 2025) ................................................................................ 13

*Hoffman ex rel. NLRB v. Beer Drivers & Salesmen's Loc. Union No. 888*,
   536 F.2d 1268 (9th Cir. 1976) .............................................................................. 3, 4

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
   774 F.3d 935 (9th Cir. 2014) .................................................................................. 12

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) ................................................................................................ 13

*Moore v. Chase, Inc.*,
   2016 WL 521320 (E.D. Cal. Feb. 10, 2016) ............................................................ 4

*Peterson v. Highland Music, Inc.*,
   140 F.3d 1313 (9th Cir. 1998) .............................................................................. 3, 4

*Reno Air Racing Ass'n v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) .................................................................................. 7

*Simon v. City & Cnty. of S.F.*,
   2024 WL 4314207 (N.D. Cal. Sept. 26, 2024) ...................................................... 13

*Soto v. Cnty. of Westchester*,
   2018 WL 527977 (S.D.N.Y. Jan. 22, 2018) ............................................................. 4

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) .................................................................................. 5

*United States v. Underwood*,
   725 F.3d 1076 (9th Cir. 2013) .............................................................................. 4, 5

*United States v. Ventresca*,
   380 U.S. 102 (1965) .................................................................................................. 5

*United States v. Weaver*,
   99 F.3d 1372 (6th Cir. 1996) .................................................................................... 4

ii

*Vasquez v. Libre by Nexus, Inc.*,
  2023 WL 360242 (N.D. Cal. Jan. 23, 2023) ................................................................ 4

STATUTES & RULES

Federal Rule of Civil Procedure 60(d) ........................................................................... 4

OTHER AUTHORITIES

NSO Group, *2025 Transparency Report* ................................................................. 9–10

Technology, *Black's Law Dictionary* (12th ed. 2024) ..................................................... 7

Technology, *Merriam-Webster* ....................................................................................... 7

Technology, *Oxford English Dictionary* .......................................................................... 7

**INTRODUCTION**

NSO's opposition is most notable for what it does not say.  Across twenty-four pages, NSO does not deny the allegations in Plaintiffs' motion, or the findings in the declaration of Plaintiffs' security engineer, Andrew Blaich.  It does not deny that it created new WhatsApp accounts after the injunction took effect.  It does not deny that it used those accounts to operate testing groups across at least thirteen countries.  And it does not deny that the delivery infrastructure behind the February and April 2026 campaigns is infrastructure NSO operates and maintains.  Indeed, NSO *admits* that it continues to use WhatsApp for NSO business operations.  NSO's opposition is argument alone, directed at a sworn evidentiary showing it nowhere contests.[1]

As it has throughout this litigation, NSO seeks to benefit from its own concealment. Its principal submission is that Plaintiffs have not adequately linked the violative conduct to NSO—even though NSO designs its operations to obscure exactly that link, routing its activity through anonymizing infrastructure and taking deliberate steps to hide its hand.  Having built that opacity, NSO now invokes the uncertainty it creates as a defense.  This Court has confronted the same maneuver before, and has declined to reward it.[2]

NSO goes further still.  It presses Plaintiffs to disclose precisely how their investigators were able to identify NSO's role in the violative conduct—the very signatures and methods that allowed detection in the first place.  That is information NSO could use to evade detection going forward, or, as NSO describes the dynamic, to continue the "cat and mouse" game.  The injunction does not entitle NSO to a roadmap for evading it.

NSO also returns to a familiar theme in seeking to shift responsibility to its customers. It argues that only its customers, not NSO, used WhatsApp to transmit the malicious links that trigger the installation of spyware.  That argument cannot be squared with NSO's own corporate representative's testimony that these "one-click" installation vectors—which NSO's opposition refers to only

---

[1]    NSO's silence here is of a piece with the merits record, where its corporate representative ultimately confirmed, point by point, Plaintiffs' account of how the 2019 attacks were carried out. Dkt. No. 800-1 (testimony of Tamir Gazneli).

[2]    *See, e.g.*, Dkt. No. 494 at 9–10 (sanctioning NSO for withholding discovery and drawing an adverse inference where NSO's concealment had prevented Plaintiffs from proving the point directly); Dkt. No. 802 at 7 (NSO "admitted they tried to conceal" how it accessed WhatsApp).

as "URLs"—are a central component of the installation-vector technology NSO develops and sells. This motion does not address NSO's customers' conduct. It asks the Court to hold NSO to the injunction's prohibition on developing, maintaining, and operating the installation-vector technology—whether zero-click or one-click—that interacts with the WhatsApp Platform to deliver spyware.

The result is straightforward. Plaintiffs have shown clear and convincing evidence through sworn and unrebutted testimony that NSO continues to create WhatsApp accounts and to use WhatsApp infrastructure and messages to trigger the installation of its spyware. That showing is particularized, sworn, and unrebutted. NSO's lawyer-generated hypotheticals do not supply a competing factual account or create a genuine evidentiary dispute. Because the conduct it establishes comprises clear violations of this Court's injunction, Plaintiffs' motion should be granted.

**ARGUMENT**

**I.    NSO Violated the Injunction By Creating WhatsApp Accounts**

The permanent injunction bars NSO from "[c]reating accounts, whether directly or through a third party, intermediary, or proxy, on the WhatsApp Platform, without first requesting and obtaining Plaintiffs' express written permission." Dkt. No. 809 ¶ 3(d). NSO does not dispute that creating accounts on the Platform violates Paragraph 3(d), nor does it claim that it ever sought or obtained that permission. The only question is whether NSO created such accounts.

As the evidence submitted alongside Plaintiffs' opening brief established, NSO created at least 23 new WhatsApp accounts after the injunction took effect on January 28, 2026. Dkt. No. 854-3 (Blaich Decl.) ¶¶ 7, 10.[3] That showing rests on the sworn declaration of Andrew Blaich, a Security Engineer Investigator on Meta's Threat Intelligence team who holds a Ph.D. in computer science, led mobile threat research at Lookout, participated in the original 2016 reverse-engineering of the Pegasus sample later attributed to NSO, and testified before the Court in this case. Blaich Decl. ¶¶ 2–4.[4]

---

[3]   NSO quibbles with the date that the injunction took place, citing language in this Court's order extending the administrative stay "for a period of up to 45 days," and arguing that the stay therefore ran the full 45 days to February 2, 2026, rather than expiring on January 28, 2026, when the Ninth Circuit denied NSO's motion to stay. Dkt. No. 863 at 6 n.1. The point does not matter here. NSO itself acknowledges that "the discrepancy is [not] material to this motion." *Id.*

[4]   Mr. Blaich's qualifications and investigative background are not new to this Court or to NSO. Mr. Blaich testified live and under oath as to his education, professional history, and his role in the original 2016 reverse-engineering of the Pegasus sample, at the August 28, 2025 hearing on Plaintiffs' motion for a permanent injunction. *See* Dkt. No. 795 (Aug. 28, 2025 Hr'g Tr.) at

2

Mr. Blaich has personally investigated NSO's activity across Meta's platforms since 2019 and is familiar with the technical signatures, infrastructure patterns, and operational tradecraft historically associated with NSO and Pegasus. Blaich Decl. ¶ 4. Mr. Blaich attributes the post-injunction accounts to NSO based on a combination of account-level and behavioral signals—including account registration patterns, device and related information, and connections to known NSO-controlled infrastructure. *Id.* ¶¶ 8–12 & Ex. A. Mr. Blaich swore to each of these facts under penalty of perjury. *Id.* at 6. Mr. Blaich is available to testify at any evidentiary hearing the Court may wish to hold. NSO offers no evidence in rebuttal. This satisfies the clear and convincing standard.

NSO's principal complaint with the account-creation evidence is that the declaration did not identify the specific accounts by number—information that could also assist NSO in obfuscating its control of other accounts. Dkt. No. 863 at 7. However, a sworn, uncontroverted declaration attributing the accounts to NSO on stated investigative bases satisfies the clear-and-convincing standard, see *supra*, and NSO cites no authority requiring more. NSO's opposition brief does not dispute that Plaintiffs have identified NSO activity on the WhatsApp platform after the injunction went into effect. Dkt. No. 863 at 6. Nonetheless, if the Court believes it necessary or valuable, those account numbers can be provided.

Moreover, NSO misapprehends how the clear and convincing evidence standard—which Plaintiffs independently met—operates where, as here, the movant's evidence stands unrebutted. NSO did not submit a declaration, a denial, a compliance certification, or evidence of any kind. It does not deny creating WhatsApp accounts since the injunction took effect, and has never represented in any form that it is complying with the injunction. That silence has a definite legal consequence: In a contempt proceeding, a court "may . . . treat as true the facts set forth in uncontroverted affidavits." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998) (quoting *Hoffman ex rel. NLRB v. Beer Drivers & Salesmen's Loc. Union No. 888*, 536 F.2d 1268, 1277 (9th Cir. 1976)). The rule originates in *Hoffman*, where the Ninth Circuit explained that a court may "narrow the issues by requiring that affidavits on file be controverted by counter-affidavits and may thereafter treat as

17:14–55:18. NSO's then-counsel was present and elected not to cross-examine Mr. Blaich on his credentials or methodology. *Id.* at 55:24–58:5. NSO's present suggestion that Mr. Blaich's background and methods are unknown or untested rings hollow.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT - CASE NO. 4:19-CV-07123-PJH

true the facts set forth in uncontroverted affidavits." 536 F.2d at 1277. A court in this district recently applied that rule, concluding that where a contemnor "ha[d] not filed any evidence to contradict the declaration" supporting the motion, the court could "treat as true the facts set forth in that declaration," and the burden then shifted to the contemnor to show that it had taken all reasonable steps to comply. *Vasquez v. Libre by Nexus, Inc.*, 2023 WL 360242, at *10 (N.D. Cal. Jan. 23, 2023).

The clear-and-convincing standard must be applied in light of that rule. The clear-and-convincing standard measures the persuasiveness of Plaintiffs' showing; it does not require Plaintiffs to overcome a competing evidentiary case that NSO never presented. Because the Blaich declaration is uncontroverted, its facts may be taken as true. *Peterson*, 140 F.3d at 1324. NSO cannot manufacture an evidentiary contest—and then fault Plaintiffs for not winning it—by submitting nothing and characterizing the resulting record as insufficient.[5]

NSO ignores this authority, and instead relies on cases that neither involved a submission as detailed as the Blaich declaration, nor arose in a posture like this one. *Soto v. County of Westchester*—a Rule 60(d) fraud-on-the-court case in the Southern District of New York—involved essentially no evidence: a pro se plaintiff alleged that his former attorney had forged a settlement and kept the proceeds but offered nothing beyond letters and pleadings, and he failed to produce his own financial records, which the court noted would have shown whether he received the funds. 2018 WL 527977, at *4 (S.D.N.Y. Jan. 22, 2018). The other cases NSO relies upon not only include affidavits with far less detail than the Blaich declaration, but involve probable cause in the criminal context.[6] In that context, probable cause is assessed *ex parte*, so the movant's showing is always unrebutted and the magistrate must "perform his detached function and not merely serve as a rubber stamp for

---

[5] Nor can NSO avoid this result by observing that the courts in *Hoffman* and *Vasquez* had directed the contemnor to file counter-affidavits. In any event, to the extent the Court concludes that a formal directive is required before uncontroverted facts are taken as true, the appropriate course is to issue an order directing NSO to come forward with evidence of its compliance, which is within the inherent authority of the Court. *See, e.g.*, *Moore v. Chase, Inc.*, 2016 WL 521320, at *5 (E.D. Cal. Feb. 10, 2016) ("[T]he Court retains the inherent authority to order any party, *sua sponte*, to show cause why sanctions should not be imposed for . . . sanctionable conduct.").

[6] In *United States v. Weaver*, the affidavits' only particularized facts were the suspect's name, address, and a description of his residence—information "any person passing" the house could supply—and it gave no indication its informant had ever proven reliable. 99 F.3d 1372, 1378–79 (6th Cir. 1996). *United States v. Underwood* rested on two facts: a personal-use quantity of marijuana and a single crate delivery months earlier. 725 F.3d 1076, 1082–83 (9th Cir. 2013).

the police." *Underwood*, 725 F.3d at 1083–84 (quoting *United States v. Ventresca*, 380 U.S. 102, 108–09 (1965)).  Here, NSO is not an absent target whose interests require heightened scrutiny of an untested affidavit; it is a represented party that received the motion, had a full opportunity to respond, and submitted nothing.  That NSO reaches for out-of-circuit authority from unrelated contexts, assessing materially weaker submissions, is itself telling.  The cases do not bear on whether a detailed, uncontroverted declaration in a civil contempt proceeding satisfies the governing standard.  The remaining authority NSO cites evaluates a pleading, not evidence in a contempt proceeding.  *See Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) (complaint did allege facts sufficient to state a claim).

## II.    NSO Violated the Injunction By Operating WhatsApp Accounts

The permanent injunction bars NSO from "developing, using, selling, offering for sale, distributing, transferring, or licensing . . . any technology that interacts with or emulates any aspect of the WhatsApp Platform in any way."  Dkt. No. 809 ¶ 3(a).  Operating accounts on the WhatsApp Platform is exactly the kind of interaction the injunction prohibits—whether NSO uses those accounts for routine business or, as here, to coordinate spyware testing.

As Plaintiffs' opening brief established, NSO used WhatsApp accounts after the injunction went into effect, including to create and operate multiple WhatsApp groups.  NSO admits that Plaintiffs identified and disabled WhatsApp groups populated with NSO employee accounts "[f]ollowing the expiration of this Court's stay" of the injunction.  Dkt. No. 863 at 6.  Plaintiffs' evidence shows that NSO used WhatsApp accounts to create at least 20 of the 34 groups after the injunction's effective date, across at least 13 countries.  Blaich Decl. ¶ 10.  Not only have Meta's investigators tied dozens of WhatsApp accounts to NSO personnel, but NSO's use of these accounts is also independently corroborated in two respects.  First, the groups carry a consistent naming convention— "Tests in [location] [date]"—tying them together as a single, coordinated set of accounts NSO used for a common purpose, not unrelated activity.  *Id.* ¶ 11.  Second, on February 4, 2026, one of these accounts transmitted an image, reported by a WhatsApp user, depicting an NSO-branded desktop mat and a phone laid out together on a desk.  *Id.* ¶ 12 & Ex. A.  Mr. Blaich attributes that account's use to NSO based on the same investigative basis described above: account registration patterns,

5

device and related information, and connections to known NSO-controlled infrastructure. *Id.* ¶¶ 9, 12.

NSO does not deny using WhatsApp accounts. Instead, it disputes what the group names mean, offering its own attorney speculation regarding what "Tests in Somalia 7.5.26" and groups like it most plausibly describe—conversations about tests "occurring 'in' another country," rather than tests of anything on WhatsApp. Dkt. No. 863 at 1. NSO does not say it investigated these groups to reach that conclusion. That silence is revealing by comparison. Elsewhere in its opposition, NSO describes in specific detail what other groups are for: for instance, "Travel NSO," is for providing "third party travel discounts to NSO employees for their private use." *Id.* at 6. NSO does not provide evidence for this assertion, but it is willing to say it. The same opposition brief that supplies a confident assertion of one group's purpose (albeit without evidence) offers only speculation about others. NSO has not explained the difference.

Similarly, NSO does not dispute that the February 4 image came from an item bearing its own logo. It offers instead a series of alternatives—that the desktop mat could have belonged to "a former NSO employee, a family member, or a competitor impersonating an NSO employee." *Id.* at 18. But NSO does not claim any of these is what happened; it offers them only as possibilities, and identifies no fact suggesting any of those are true. More to the point, an NSO-branded item appearing in an image sent from an account NSO used is not something Mr. Blaich encountered for the first time here. As Mr. Blaich explains, "NSO branding in testing account messages is a recurring indicator that the Threat Intelligence team has historically associated with NSO" activity. Blaich Decl. ¶ 12; *see also* Dkt. No. 795 (Aug. 28, 2025 Hr'g Tr.) at 47:24–48:2 (explaining that "the tester will take videos and images of things that are right in front of them"). NSO's list of hypothetical alternatives does not engage that documented pattern, let alone rebut it.[7]

NSO's argument that the injunction does not bar it from "using" WhatsApp ignores the history surrounding the injunction's entry. As NSO concedes, an injunction is read "in light of the

---

[7] NSO suggests in passing that Plaintiffs' access to the content described in the Blaich declaration is somehow improper. Dkt. No. 863 at 17 n.4. It is not. As the declaration explains, WhatsApp messages are end-to-end encrypted, and WhatsApp obtains message content only when a user invokes the in-application reporting function and chooses to share it. Blaich Decl. ¶ 6. Each item of content described here was obtained through that mechanism. *Id.* ¶¶ 12, 14.

circumstances surrounding the order's entry," including "the litigation history." Dkt. No. 863 at 12 (citing *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1133–34 (9th Cir. 2006)). That history forecloses NSO's reading. In opposing entry of the injunction, NSO argued that the injunction "would prohibit NSO employees from using WhatsApp for internal communications, which NSO employees currently do." Dkt. No. 759-2 at 14. The Court nonetheless entered the injunction and addressed that conduct directly: "while it may remain legal to create new Whatsapp accounts ***and to use Whatsapp***, the facts in this case show that such activities have been used as a precursor to illegal activities, and thus . . . ***such activity must be enjoined***." Dkt. No. 802 at 17 (emphasis added). The conduct NSO now characterizes as innocuous use of WhatsApp is the precise conduct it told the Court the injunction would prohibit—and the precise conduct the Court said it was enjoining. NSO has since told the Ninth Circuit the same thing. In arguing to stay the injunction, it described this Court as having "enjoined use of the WhatsApp application," Dkt. No. 825 at 20, as "enjoining the mere use of WhatsApp," *id.* at 20–21, and as "prohibit[ing] all interactions with WhatsApp," Reply in Support of Defendants-Appellants' Motion to Stay Permanent Injunction Pending Appeal at 15, *WhatsApp v. NSO Grp. Techs. Ltd.*, No. 25-7380 (9th Cir. Jan. 12, 2026). NSO cannot read the injunction one way to attack it on appeal and the opposite way to escape contempt below.

NSO's narrow interpretation also distorts the text of the permanent injunction. Paragraph 3(a) prohibits NSO from "using . . . any technology that interacts with or emulates any aspect of the WhatsApp Platform in any way." Dkt. No. 809 ¶ 3(a). A cellphone is "technology" under any definition of the term.[8] And the WhatsApp Platform is defined to include the WhatsApp client applications themselves. Dkt. No. 809 at 1 (defining "WhatsApp Platform" to include "WhatsApp servers and the WhatsApp client applications"). Using a phone to send a message through the WhatsApp application is therefore using technology that interacts with the Platform—whether the message concerns spyware deployment or, as NSO insists (without evidence) was the case here, other

[8] *See* Technology, *Black's Law Dictionary* (12th ed. 2024) ("Modern equipment, machines, and methods based on contemporary knowledge of science and computers"); Technology, *Merriam-Webster* ("a machine, piece of equipment, method, etc. that is created by the practical application of scientific knowledge"); Technology, *Oxford English Dictionary* ("machinery, equipment, devices, etc., developed from the practical application of scientific and technical knowledge," now used "specifically with reference to digital devices, software, etc.").

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT - CASE NO. 4:19-CV-07123-PJH

business communications among employees.  NSO nowhere argues that its employees use something other than "technology" to access WhatsApp, or that a phone running the WhatsApp client somehow falls outside the Platform's own definition.  NSO's account of what its employees were discussing— as opposed to whether they were using the Platform at all—is the only thing it disputes, and it is not the question Paragraph 3(a) asks.

NSO's fallback argument—that reading the injunction to bar its use of WhatsApp would impose an impermissible "punitive sanction" untethered from the underlying conduct, Dkt. No. 863 at 15—rests on a premise the record does not support.  The accounts at issue are *not* limited to NSO employees messaging family or arranging travel.  They include testing accounts, used to operate testing groups that confirm the functionality of NSO's spyware.  Blaich Decl. ¶¶ 8, 10–11.  That is the conduct the Court enjoined precisely because it "ha[s] been used as a precursor to illegal activities."  Dkt. No. 802 at 17.  A contempt finding directed at the conduct that gave rise to the injunction is remedial, not punitive.  Moreover, to the extent NSO contends that other communications are unrelated to the conduct that produced liability, it offers no evidence to support that assertion.

III.    **NSO Violated the Injunction By Deploying One-Click Malicious URLs Through the WhatsApp Platform**

The permanent injunction bars NSO from "developing, using, selling, offering for sale, distributing, transferring, or licensing . . . any technology that interacts with or emulates any aspect of the WhatsApp Platform in any way."  Dkt. No. 809 ¶ 3(a).  NSO continued to develop, maintain, and provide an integrated one-click installation vector that used WhatsApp as the delivery channel in at least two post-injunction campaigns that WhatsApp has discovered.  The relevant "technology" is neither the bare text of a URL nor the third-party server viewed in isolation.  It is the complete NSO-controlled method for generating and maintaining the malicious link, delivering it to an identified target, redirecting the target, and attempting to install spyware.

The campaigns are documented and attributed.  In February 2026, malicious URLs using the domain ghazacast[.]com were sent to targets over WhatsApp; a second campaign followed in April 2026, using ikhwancast[.]com.  Blaich Decl. ¶¶ 16–17.  Mr. Blaich attributes both to NSO with high confidence on five independent bases: a distinctive *cast[.]com URL structure the team associates

8

with one-click malicious delivery; redirect behavior consistent with NSO's documented Pegasus delivery infrastructure; impersonation lures matching this customer's prior campaigns; a targeting profile matching locations of prior Pegasus use; and continuity with pre-injunction activity—the same *cast[.]com convention appears in a France 24 spoof (fr24cast[.]com) the team had already tied to this customer before the injunction.  *Id.* ¶¶ 15, 18.  As Mr. Blaich concludes, the campaigns rely on "NSO-operated delivery infrastructure, NSO-maintained malicious URLs, and operational tradecraft developed by NSO," and the delivery infrastructure "is . . . infrastructure that NSO continues to operate."  *Id.* ¶ 19.

NSO's argument that it merely licenses inert technology its customers operate, Dkt. No. 863 at 18–20, artificially separates the installation vector into isolated pieces.  The injunction does not prohibit only a particular line of code or a server considered in a vacuum.  Paragraph 3(a) expressly reaches technology that interacts with the WhatsApp Platform "including as a method or approach used to install and deploy the technology"—that is, an "installation vector."  Dkt. No. 809 ¶ 3(a).  This Court found on summary judgment that NSO designed and operates the Pegasus delivery system, and NSO admitted that the entire installation process—executing the intrusion, installing the agent, and extracting data—was "a matter for NSO and the system to take care of, not a matter for customers to operate."  Dkt. No. 796-3, Ex. 10 at 68:9–18; *id.* at 174:1–11 (NSO's then-CEO testifying that the "main components" of Pegasus include "installation vectors," in addition to "the agent that will ultimately be installed" and other pieces of technology); *see* Dkt. No. 494 at 7–8, 11–12.  NSO's own product literature describes the same division of labor: to deploy one-click vectors like those used in these campaigns, the customer "should only insert the target phone number," and "[t]he rest is done automatically by the system."  Dkt. No. 1 at 37.  That same literature confirms NSO controls the link infrastructure, not the customer: NSO defines and purchases the domains used as the installation link with its White Services team.  *Id.*; *see also* Dkt. No. 753 at 963:12–15 (NSO's VP of R&D testifying that the White Services team "was responsible for the acquiring of this infrastructure").  The customer identifies the target; NSO supplies and runs everything that makes the URL work.  More recently, NSO publicly represented that it "maintains the capability to suspend or disable systems where credible concerns of misuse arise," and that its safeguards include "kill-switch

capabilities." NSO Group, *2025 Transparency Report* 13, 18, https://www.nsogroup.com/wp-content/uploads/2026/01/2025-Transparency-and-Responsibility-Report.pdf. A company that maintains the control to disable the system at will is in control of it. The customer's role in pressing "send" does not convert NSO's own running technology into something NSO no longer operates.

NSO's argument that a URL is not "technology" attacks a claim Plaintiffs do not make. NSO frames the question as whether a bare URL—"simply [an] address[]," like a phone number or email address, Dkt. No. 863 at 19—can be "technology" under Paragraph 3(a) or "computer code" under Paragraph 4. But the violation is not the bare string of characters in a link. It is the delivery infrastructure that generates, hosts, and resolves these URLs—infrastructure that NSO "continues to operate." Blaich Decl. ¶ 19. That infrastructure consists of an entire system, not an address: it stages the domains, executes the redirect to the impersonated entity's site, and attempts to deliver malware to the target. *Id.* ¶¶ 14, 18. A system that performs those functions is "technology" under any definition, including the one NSO offers. *See* Dkt. No. 863 at 19–20. And as shown above, NSO does not merely pass along a customer's link—it defines and purchases the domains and operates the infrastructure those URLs depend on. That is what Paragraph 3(a) reaches, and Plaintiffs need not show that a URL standing alone is "technology" to prevail.[9]

NSO invokes the injunction's exclusion of its foreign sovereign customers, Dkt. No. 863 at 18–19 (citing Dkt. No. 809 ¶ 1), but that provision does not reach the conduct at issue. Paragraph 1 provides that NSO's foreign sovereign customers are not Prohibited Parties; it exempts the customers from being bound. It does not exempt NSO. Plaintiffs do not ask the Court to enjoin any customer, but instead ask the Court to hold NSO responsible for operating technology that interacts with the WhatsApp Platform—conduct Paragraph 1 leaves squarely within the injunction's reach. NSO's contrary reading is foreclosed by its own positions. NSO told the Ninth Circuit that the injunction

---

9    NSO's postal-service analogy, Dkt. No. 863 at 22 n.7, misses the point. Plaintiffs do not contend that every web address capable of being written in a letter becomes a Postal Service installation vector. The evidence here concerns an operational spyware installation vector that was actually deployed to identified targets through WhatsApp, using links and infrastructure generated, maintained, and controlled by NSO. That the same underlying technology might be adapted to another communications channel would not erase its actual interaction with WhatsApp in these campaigns.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT - CASE NO. 4:19-CV-07123-PJH

threatens its business precisely because it must disable customer access to NSO-maintained technology that collects data through the WhatsApp application. Dkt. No. 825 at 22. NSO cannot describe that technology as its own when arguing irreparable harm on appeal, and as the customer's when avoiding contempt below. The carve-out exists because the customers "are not before the court and have not been named as defendants," Dkt. No. 802 at 14, not to let NSO route its own enjoined conduct through a customer and claim the customer's immunity as its own. This Court already declined NSO's effort to expand that exclusion. Dkt. No. 808 at 1.

NSO already litigated—and lost—the argument that the injunction does not reach conduct that bypasses WhatsApp's servers. A recurring theme of NSO's opposition is that its conduct cannot violate the injunction unless it involves WhatsApp's servers. *See, e.g.*, Dkt. No. 863 at 10–11. NSO has made that argument before, and this Court has rejected it. Objecting to the proposed injunction, NSO argued that the decree improperly reached "any collection of WhatsApp data from target devices, whether or not the collection involves any use of WhatsApp servers," and conduct involving "absolutely no use of WhatsApp servers." Dkt. No. 805 at 3–4. The Court overruled that objection, holding that the argument had been "fully raised and considered throughout this case" and "already rejected," and that NSO had "present[ed] no basis for reconsidering it." Dkt. No. 808 at 1. NSO then repeated the same characterization on appeal, describing the injunction as reaching "any technology to collect information from user devices if the target information comes from the WhatsApp application—even if the entirety of the process . . . never touches WhatsApp servers." Dkt. No. 825 at 22. NSO understood, and told two courts, that the injunction reaches conduct that does not pass through WhatsApp's servers. It cannot now defend its conduct on the ground that no WhatsApp server was involved—particularly where the conduct documented here does interact with the WhatsApp Platform, through the accounts and client NSO used to deliver the URLs. Blaich Decl. ¶¶ 13, 19. That history also answers NSO's characterization of the injunction as a commercial death sentence. NSO told this Court and the Ninth Circuit that the injunction would "force NSO out of business," Dkt. No. 759-2 at 13, because it would "eliminate most if not all of NSO's current Pegasus sales," Dkt. No. 825 at 23—Pegasus being, by NSO's own account, "100% of NSO and Q Cyber's sales" in 2025, Dkt. No. 813-1 ¶ 3. NSO's position, in other words, was that it could not comply

11

with the injunction and continue operating as before.  The conduct documented above is consistent with that prediction: the accounts, testing groups, and URL campaigns described here are the kind of activity NSO told this Court and the Ninth Circuit it could not give up.  The Court has already rejected NSO's argument that it cannot survive in compliance with the injunction, Dkt. No. 808 at 1, and NSO's continuation of the very conduct it said it depended on does not entitle it to relitigate that point now.  In any event, "harm caused by illegal conduct does not merit significant equitable protection," *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017), so if NSO cannot generate revenue without violating this Court's orders that is a problem of NSO's own creation.

NSO's remaining response is that Plaintiffs have not proven the infrastructure's mechanics with enough specificity—that the *cast[.]com pattern might be spoofed, Dkt. No. 863 at 13 n.2, 19, or that its interaction with the Platform is not established in technical detail, *id*. at 21.  NSO is not entitled to demand that precision.  This Court sanctioned NSO for withholding the discovery that would establish how its systems operate, and drew an adverse inference because NSO's concealment had prevented Plaintiffs from proving the point directly.  Dkt. No. 494 at 9–10.  As the Court put it, "by not telling us how they're collecting WhatsApp messages[,] the burden is improperly put on the plaintiffs"—conduct NSO "admitted they tried to conceal."  Dkt. No. 802 at 7.  NSO cannot manufacture an evidentiary gap and then fault Plaintiffs for not filling it.  And NSO has submitted nothing now—no denial, no declaration, no contrary evidence—so the uncontroverted showing in Mr. Blaich's declaration is taken as true and the burden has shifted to NSO.  *See supra* Section I.  NSO has not carried it.

The foregoing answers NSO's textual arguments on their own terms.  But as the Ninth Circuit has held, "[i]n deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded."  *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014).  That principle answers the interpretive approach running through NSO's opposition.  NSO repeatedly invokes canons borrowed from statutory and contractual construction.  *See, e.g.*, Dkt. No. 863 at 14–15 (*expressio unius*); *id.*

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT - CASE NO. 4:19-CV-07123-PJH

at 16 (ambiguities resolved against the drafter).  A contemnor does not escape an injunction by adopting a strained reading of its terms; where a party "unreasonably" resolves a supposed ambiguity in its own favor and acts on that reading, it violates the decree.  *Sea Shepherd*, 774 F.3d at 954.  So even if NSO's textual reading were correct—and it is not—"parties may be held in contempt for violating the spirit of an injunction."  *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1177 (9th Cir. 2025); *see also Simon v. City & Cnty. of S.F.*, 2024 WL 4314207, at *3 (N.D. Cal. Sept. 26, 2024) ("Arguably, this conduct does not violate the strict terms of the injunction . . . [However,] there can be no question that the conduct violates the spirit of the injunction.").

The Supreme Court explained long ago why the rule must be this way.  Permitting a contemnor to defeat a decree by devising a plan that its specific terms did not anticipate "would give tremendous impetus to the program of experimentation with disobedience of the law."  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).  Each time the contemnor found a new route around the decree's letter, a new decree would have to issue, and "a whole series of wrongs is perpetrated and a decree of enforcement goes for naught."  *Id.* at 193.  That is the dynamic NSO's reading invites.  This Court enjoined NSO's interaction with the WhatsApp Platform because, across years of this litigation, NSO repeatedly redesigned its conduct to evade each measure the prior round had foreclosed.  Dkt. No. 802 at 5–9; Dkt. No. 494 at 12.  An injunction read to permit every interaction that its terms did not specifically enumerate would reward exactly that pattern.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion.  At minimum, the undisputed creation of 23 accounts after February 2, 2026 establishes contempt of Paragraph 3(d).  The coordinated testing operations and post-injunction one-click campaigns independently establish violations of Paragraphs 3(a) and 4.  The Court should impose the prospective coercive and compensatory relief set forth in Plaintiffs' proposed order.

Dated:  June 29, 2026                         Respectfully Submitted,

DAVIS POLK & WARDWELL LLP


By:  */s/ Micah G. Block*
    Greg D. Andres
    Antonio J. Perez-Marques
    Luca Marzorati
      (admitted *pro hac vice*)
    DAVIS POLK & WARDWELL LLP
    450 Lexington Avenue
    New York, New York 10017
    Telephone: (212) 450-4000
    Facsimile: (212) 701-5800
    Email:  greg.andres@davispolk.com
          antonio.perez@davispolk.com
          luca.marzorati@davispolk.com

    Micah G. Block (SBN 270712)
    DAVIS POLK & WARDWELL LLP
    900 Middlefield Road, Suite 200
    Redwood City, California 94063
    Telephone: (650) 752-2000
    Facsimile:  (650) 752-2111
    Email: micah.block@davispolk.com

    *Attorneys for Plaintiffs*
    *WhatsApp LLC and Meta Platforms, Inc.*

14