# EXHIBIT E

**Pages 1 - 54**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Phyllis J. Hamilton, Judge

WHATSAPP INC., et al., )
)
Plaintiffs, )
)
VS. ) NO. C 19-07123 PJH
)
NSO GROUP TECHNOLOGIES )
LIMITED, et al., )
)
Defendants. )
)

Oakland, California
Thursday, August 20, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
**BY: MICAH GALVIN BLOCK, ESQ.**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
**BY: LUCA E. MARZORATI, ESQ.**
**ANTONIO J. PEREZ-MARQUES, ESQ.**
**GREG D. ANDRES, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by: James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

**APPEARANCES**: **(CONTINUED)**

For Defendants:

HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2300 North Street Northwest, Suite 643
Washington, DC 20037

**BY: KELLEN DWYER, ESQ.**

**Thursday - August 20, 2026** **1:35 p.m.**

**P R O C E E D I N G S**

---000---

**THE CLERK:** Please remain seated and come to order. The United States District Court is now in session with the Honorable Judge Phyllis J. Hamilton presiding.

Your Honor, Calling Civil Case Number -- Your Honor, now Calling Civil Case Number 19-CV-0- -- oh.

**THE COURT:** I think that we'll get too much feedback.

**THE CLERK:** Yeah, the mic.

**THE COURT:** Can they -- can you hear me?

**MR. BLOCK:** Yes, Your Honor.

**THE COURT:** Okay.

**MR. DWYER:** Yes, Your Honor.

**THE COURT:** Okay. My -- my problem.

I'm sorry. I had thought that this was going to be an in-person proceeding. I think some signals got mixed here at the court, and it obviously was scheduled for a remote proceeding and not an in-person proceeding, but I can see you.

Let's see. How do -- just -- just bear with me a minute. How do I get this to change the view on this one so I can see everybody much bigger?

**THE CLERK:** Do you mind if I show you --

**THE COURT:** No.

Oh, it's that one. Yes.

**THE CLERK:** Uh-huh.

**THE COURT:** Okay. Great. Thank you.

No, no, no. That's fine. Thank you.

**THE CLERK:** You're welcome.

**THE COURT:** Oh. Okay.

**THE CLERK:** Calling Civil Case Number 19-CV-07123-PJH, in the case of WhatsApp Inc., et al., versus NSO Group Technologies Limited.

Counsel, can you please state your appearance, beginning with plaintiffs' counsel.

**MR. BLOCK:** Thank you.

Good afternoon, Your Honor. Micah Block, from Davis Polk, for plaintiffs; also with me, Mr. Marzorati.

We have Mr. Andres and, I believe, also Mr. Perez in the -- not -- not promoted as panelists. So if the Court wants to hear from them, they can. But the two of us will be addressing the Court today, if that works for Your Honor.

**THE COURT:** Yeah, that's -- that's fine with me.

**MR. BLOCK:** Thank you.

**THE COURT:** Okay. And for the defense counsel, you-all are new to me, and I don't know who's who.

**MR. DWYER:** Yes, Your Honor.

Kellen Dwyer for NSO Group. Very nice to meet you.

**THE COURT:** Good to meet you.

And you're by yourself?

**MR. DWYER:** I am.

**THE COURT:** Okay. All right. Now, we're going to -- I'd like to also address the discovery disputes that you-all have written to me about, but we're going to start first with the reason why this matter's being heard today, and that's WhatsApp's -- the plaintiffs' motion for a contempt finding in this matter.

And which -- Mr. Block or Mr. Marzorati, which one of you are going to argue that?

**MR. BLOCK:** I'll address that, Your Honor, and Mr. Marzorati has the discovery dispute.

**THE COURT:** Okay. All right. Okay. Let's start first -- everybody seems to agree on the standard and that clear and convincing evidence is -- is needed.

I see Mr. Andres has appeared -- good afternoon -- and Mr. Perez-Marques, although I read somewhere that you were in trial. Is that not correct?

**MR. PEREZ-MARQUES:** Your Honor, we do have a trial going on for Meta before Judge Gonzalez-Rogers, but I do not need to be there on this particular day.

**THE COURT:** Okay. Yeah.

Okay. So let's start, then, with Mr. Block.

So we all agree on the standard here. I've read your papers. Some things aren't clear to me, but I'd like to hear your presentation first.

**MR. BLOCK:** Thank you, Your Honor.

So very happy to address any questions that Your Honor may have. I wanted to start briefly by addressing just a short amount of the history in this case.

And specifically, Your Honor will recall -- or may recall ordering production of the Pegasus code during discovery, and then there was a hearing about that because NSO purported to have complied with that order.

But, in fact, they had sent a letter in Israel and made information available in a way that wasn't useable in this court under various restrictions. And so that is the sort of self-help rereading of the language of a court's order that we are finding here again exactly.

So, with that background, what we have found -- and, again, this is based only on things that WhatsApp is able to see on its side so far. We found three categories of conduct that violate the injunction, and if -- with Your Court's permission, I do want to address a fourth very briefly just at the end.

So those categories -- first, I just want to talk about creating WhatsApp accounts. I think there's no dispute that the injunction bars creating WhatsApp accounts. That's Paragraph 3B. It's very clear, and WhatsApp has found -- I think the number is 23 in the declaration -- accounts associated with NSO created since the injunction came down,

regardless of some quibble about which day it may have become effective.

The evidence in support is an affidavit. It's uncontroverted. It has -- is not denied. So NSO has come back. They did not deny having created accounts. All they do is say we haven't really proven it. They've had every opportunity to come forward and say, "They aren't really ours" or "We've stopped creating accounts" or what have you, and they have not done that, an uncontroverted affidavit.

We've cited cases in the brief. *Peterson* against *Highland Music* is one that's sufficient for a finding of contempt in this context.

The second category of conduct is using WhatsApp accounts. So NSO seems to suggest their reading of Your Honor's injunction is that, sure, they're barred from creating new WhatsApp accounts, but they're allowed to go on using WhatsApp accounts they used to have for any purpose, notwithstanding the plain language of Your Honor's order.

Now, the injunction prohibits NSO from, quote, "using any technology that interacts with or emulates any aspect of the WhatsApp platform in any way." The platform is both the servers and the client applications, and NS- -- sorry. Plaintiffs' submission, Your Honor, is that there is no ambiguity in that language and that it bars the use of WhatsApp by NSO.

NSO has said that that language doesn't enjoin it from using WhatsApp, but they know that's not the case. And in a filing asking for a stay of your injunction to the Ninth Circuit, which is on your docket at Number 825, they complained this can't go into -- into effect because it enjoins use of the WhatsApp application. It enjoins the mere use of WhatsApp. That's at Page 20 of their brief, which is 25 of the docket number.

So there's absolutely no ambiguity here, and there's also no question, as a matter of fact, that they are using WhatsApp. They respond to the motion by saying What- -- plaintiffs shut down NSO's WhatsApp groups. So that is confirmation that the techniques Mr. Blaich used to associate those groups with NSO -- they work. They work.

NSO says, "Yeah, these are our groups, but some of them are for travel discounts or the like," but that's an admission that the groups that Mr. Blaich identified are NSO groups. So I don't think that there's any real dispute that NSO is continuing to use WhatsApp.

Their only argument is that they can read Your Honor's language -- after they said, "Please don't issue this injunction that will stop me from using WhatsApp," they want to read it now and say the injunction you issued does not stop them from using WhatsApp.

They make some other arguments --

**THE COURT:** Let -- let me interrupt you --

**MR. BLOCK:** Please.

**THE COURT:** -- for a second.

With regard to the -- the 23 accounts that Mr. Blaich refers to, do you know whether or not those were preexisting accounts or newly created accounts?

**MR. BLOCK:** Those -- so 23 -- at least 23 accounts newly created. And WhatsApp has information, once it identifies account -- an account, when it was created.

And so this is in Mr. Blaich's dir- -- declaration, and he identifies that there are 23 that have a start date later than either of the effective dates that -- again, there's some question, I suppose, about the start, but it's not material, as NSO concedes. So that's 23 accounts with start dates that are due.

In addition, he identifies at least -- I believe the number is 34 WhatsApp chat groups with ongoing activity after the injunction. So that would be like a group conversation that includes accounts and is having -- again, plaintiffs can't see the content of the messages because they're end-to-end encrypted.

But by the same tools that associated those accounts with NSO, we can see that they are NSO-related, and their chat group names -- those are not encrypted, and they're things like "Tests in Somalia" or "Tests in Guinea." Now, what NSO did, in

response, is say --

**THE COURT:** What do you mean -- what do you mean by "NSO-related"?

**MR. BLOCK:** Well, they're attributed to NSO, and that's through a series of techniques that Mr. Blaich describes in context -- in -- in concept in terms of the infrastructure related to NSO that allows us to associate activity with them.

Now, one might ask -- and NSO has tried to -- can you know for sure? What about a false flag? Well, we do -- I -- two responses, Your Honor. One is we know for sure because they didn't deny it.

And they say, in their opposition, WhatsApp shut down NSO's groups -- that means the groups that we use these techniques to identify were theirs -- and they're complaining that we shut down some of them that were -- they say they were innocuous. Some -- at least some of them are about travel discounts. So it is corroborated by their own response, even though they haven't put in evidence.

And then I'll just say forthrightly, Your Honor, plaintiffs are very concerned here about disclosing to NSO the precise tools available to NSO's victims, such as plaintiffs, to track their activity. And so it is well within NSO's ability to know exactly what it's doing and to controvert anything Mr. Blaich has said if, in fact, the conduct isn't theirs.

But to force us to give up the specific markers by which we were able to identify these particular accounts -- and, frankly, we don't know whether there may be others because their whole business is to be in secret, to be covert. To force us to give that up would be problematic, and what we've done here is say, "Here is an affidavit. If you can controvert it, please go ahead."

And we were very curious to see whether, in opposition, NSO would submit something saying, "No, those weren't ours. In fact, we are no longer using WhatsApp. In fact, we have stopped using WhatsApp to deliver installation vectors." They didn't say those things.

They complained that Mr. Blaich didn't give up all of his tools and techniques, but they don't even deny that this is theirs and that, in some ways, such as the one I pointed to, they're actually confirming that what Mr. Blaich pointed to is their conduct.

**THE COURT:** Uh-huh. Okay.

**MR. BLOCK:** Now, the -- shall I continue, Your Honor?

**THE COURT:** Yeah.

**MR. BLOCK:** Just briefly, the third category that we talk about in the briefing is using WhatsApp to deliver installation vectors.

Now, these are the sort of social engineering or phishing vectors where somebody sends a link, and if you click on the

link -- it's one-click instead of zero-click. If you click on that link in your WhatsApp message, it's going to cause your phone to go and download Pegasus.

We have a similar pattern. We have associated that with NSO activity, and Mr. Blaich describes a whole series of markers in terms of the form of the URL and similar things that he was used -- able to use to associate them. There's no denial from NSO.

NSO's argument on that one -- they have a couple. They say using WhatsApp to deliver a URL is not -- it's actually hard for me to track their argument -- is not actually using WhatsApp, or it's not using technology that interacts with WhatsApp because a URL is not technology or because WhatsApp can't interact with itself. I think those arguments are not colorable, Your Honor.

And so when you enjoined them from using any technology that interacts with WhatsApp in any way, that reached the pure use of WhatsApp. It surely reached -- and you have a separate phrase on this in your injunction -- using WhatsApp to -- as a -- a means to install Pegasus.

So that's -- they're actually continuing to use -- they don't have the same hack-to-server installation vector that they used to, but they're continuing to use WhatsApp to install Pegasus. And that brings me, just very briefly, to a fourth category of conduct, Your Honor.

Now, this one -- we have no way of establishing with evidence because the evidence is entirely within NSO's control. But it sure looks like, because we know that they're continuing to send installation vectors, that they're con- -- continuing to install Pegasus.

And what they have said, in asking you to narrow the injunction, in asking the Ninth Circuit to stay the injunction, and in asking the Ninth Circuit to overturn it, is that any injunction that stops Pegasus from collecting WhatsApp messages would be an absolute end of their business, and they cannot continue. Well, they seem to be continuing.

And so, in addition to the findings we'd asked for in the briefing, we think it's very important that we now look at whether NSO is, in fact, continuing to offer software that collects WhatsApp message- -- messages off of devices. And the simple thing to do there, Your Honor, is just to order them to describe the steps they have taken to comply with your injunction, and let's test whether or not it complies with the injunction as you wrote it.

So we've asked for a finding of contempt, based on the evidence we've submitted, for coercive sanctions to take care of the violations we know are occurring. And I'm now asking in addition, Your Honor, that -- for an order to show cause why this should not be held in contempt, in addition, for collecting WhatsApp messages.

And I sure hope they prove me wrong on that.

**THE COURT:** Okay. I'm -- I don't think that we can really adjudicate the fourth category in the context of this matter, given that the defense hasn't had any opportunity to file a response.

And I don't ex- -- I don't expect Mr. Dwyer to be able now -- I don't know if it's the first time he's heard it or not, but that's just not something that I can take into account for today's purposes.

Now, there is no dispute, is there not -- what I'm understanding -- well, two things. Two things. One, there clearly is no explicit prohibition in the injunction against using preexisting accounts. It's not something that even occurred to me specifically as a category.

One of the reasons I asked the -- you-all to -- to draft a more -- a detailed injunction is because I still don't really know how all of this works. I don't know what NSO does and what its customers do. That was not made -- I was not made privy to that information during the course of the trial. There was so much secrecy. So I don't know who's -- who's responsible for what part of how the surveillance is conducted.

Okay. So there are two parts to it. Both NSO has a part, its customers have a part, and I don't know which. But clearly, it seems to me that one of the arguments that NSO is making -- and I'm not -- and I'll give Mr. Dwyer an opportunity

to respond, but it's -- he's challenging whether or not the injunction specifically precludes the use of -- or the access -- the use of preexisting accounts.

It's -- but I -- but I -- your argument doesn't really depend upon that, it -- it seems to me. You're essentially saying that the use -- that the 23 accounts that were discovered by Mr. Blaich represents -- came from new accounts, and the injunction clearly prohibits the creation of new Whats- -- WhatsApp accounts.

Am -- am I missing something here?

**MR. BLOCK:** So as to the -- let me try to take it in reverse order, if I may, Your Honor.

The creation of new accounts is sufficient to establish that they are in contempt. They have created new accounts. That is contemptuous, no question about the text of the order.

Where I part ways with Your Honor is where you began by not recalling -- or not seeing in the language a prohibition on the use of preexisting accounts. And I recognize that the language does not say "use of preexisting," but if you look at the history here, this is exactly how the injunction was litigated all the way through.

And so -- we address some of this in our reply brief on Page 6. NSO argued, when they were opposing the injunction, that it should be denied or narrowed because it, quote, "would prohibit NSO employees from using WhatsApp for internal

communications." That's Docket 759-2, at 14. They said, "Don't do it because that's what it would prohibit."

And Your Honor did order a change to the use provision, but you didn't say, "I accept that problem." To the contrary, Your Honor said, while it may -- this is Docket 802, at 17. And I hesitate to quote Your Honor back, but the language is very important because it forms the basis for our understanding here. Well, the language of the injunction forms the basis.

But just briefly, "While it may remain legal to create new WhatsApp accounts and to use WhatsApp, the facts in this case show that those activities have been used as a precursor to illegal activities and that such activity must be enjoined."

And if you recall -- please, Your Honor.

**THE COURT:** Yeah.

I pre- -- I reread that portion of the order before the hearing, and I'm just trying to understand whether or not that could be construed, the "use" -- the "using" in that sentence, as referring to the newly created accounts and not to preexisting accounts --

**MR. BLOCK:** I -- I --

**THE COURT:** -- for -- for whether or not they were preexisting or not. It's just not something that I was tuned in on because that language wasn't specifically used.

So is this just sort of a semantic game that's being played by NSO in interpreting the injunct- -- injunction order?

**MR. BLOCK:** I think the answer is yes, Your Honor, and let me explain further.

We didn't specify preexisting and post-existing because we did not need to, and so using WhatsApp accounts certainly isn't restricted.

And I think it is fair to infer that NSO had that exact same understanding because, after the injunction came down, after you said, "Don't use 'use' twice" -- and we made a clarifying change, which wasn't about preexisting or post-existing -- they went to the Ninth Circuit. And, again, this is on your docket.

When they asked them to stay -- it's Docket 825 -- they said, "You ought to stay this because what Judge Hamilton has done is enjoined the use of WhatsApp." And it was absolutely sensible for that to happen because the way that they developed the installation vectors that we talked about so much at the trial in this case was by using WhatsApp. By creating accounts, those were preexisting accounts.

In fact, this brand-new reading that contradicts their own reading after the injunction came down in which they now want you to impose on your injunction would allow them, in theory, to continue using the same WhatsApp accounts that they have running testing message against each other.

Now, there are other provisions in the injunction that I think have some import here, but it is absolutely sensible

relative to the conduct that you heard that we asked for, and Your Honor granted, an injunction as to the use of WhatsApp.

Now, it also enjoined the creation of new WhatsApp accounts, but it nowhere says, "Hey, by the way, here's a carve-out. I heard your objection, NSO. And therefore, if you want to keep using WhatsApp day-to-day for your business for whatever, go right ahead." We asked for that to be enjoined, and I think, yeah, Your Honor -- well, the -- NSO understood that to be the effect of your injunction, as they said on your docket.

**THE COURT:** Uh-huh.

Okay. Okay. Are you finished now, Mr. Block?

**MR. BLOCK:** I'm happy to answer more questions, of course, Your Honor. But if you're ready to move on, you certainly should.

**THE COURT:** Okay. Mr. -- Mr. Dwyer, I am having some difficulty in reconciling the position you're taking on appeal, that you were precluded from using without the distinction between preexisting or later-created WhatsApp accounts.

I don't understand how you reconcile the two of those and make the argument that you're making with regard to preexisting conditions. That's one -- one question. I'd like you to reconcile that, if you can.

And -- and then with regard to the actual arguments that are made about creating, I don't hear -- I didn't read any

denial about -- to Mr. Blaich's testimony about the -- or his declaration about the 23 new accounts. There was no denial. Instead, you said he didn't sufficiently identify them, didn't provide the account numbers, et cetera, and then you raised the argument about there having been no bar against using preexisting accounts.

So those are the two main difficulties I'm having with NSO's argument.

**MR. DWYER:** Well, thank you, Your Honor. I appreciate the opportunity to address you.

I think -- I want to just briefly talk about the burden of proof because I don't think we have agreement on it, and it goes directly to kind of what we have to deny and whether we can deny some of this conduct without more information.

So --

**THE COURT:** It was the standard of proof that I had referred to earlier. You do agree on that?

**MR. DWYER:** Well, I think that they have a very --

**THE COURT:** Because the standard -- the standard is high. It requires clear and convincing evidence; correct?

**MR. DWYER:** Yes, Your Honor.

**THE COURT:** Okay.

**MR. DWYER:** I think we have a different understanding from WhatsApp about how the burden of proof works --

**THE COURT:** Okay.

**MR. DWYER:** -- that they seem to have this burden-shifting idea. That is -- is just not what the cases say.

So the Ninth Circuit has said, again and again -- and this is from *FTC v. Affordable Media*, 179 F.3d 1228, Pin Cite 1239. It was repeated in *Stone v. City of San Francisco*, which is in our briefs.

And they say, "The standard for finding a party in civil contempt is well-settled. The moving party has the burden of showing, by clear and convincing evidence, that the contemnors violated the order. The burden then shifts to the contemnors to demonstrate why they were unable to comply."

If you read the reply briefs, WhatsApp has this idea that they can submit a kind of intentionally vague affidavit that doesn't reach clear and convincing evidence; but then, nonetheless, the burden shifts to the defendant to put on an affidavit denying it; and if you don't have evidence from the defendant, that -- you know, they win because they have more evidence, even if they don't have clear and convincing evidence.

That is not how the burden-shifting works. It says very clearly that only after they show clear and convincing evidence, the burden then shifts to the defendant. The cases that they cite deal with situations where the plaintiff put on clear and convincing evidence, and then the Court ordered the

defendant to respond, and the defendant refused to respond.

So in *Vasquez*, for instance, you had a plaintiff submit an affidavit saying, "We're owed money under this court order. We were not paid," pretty clear -- about as clear evidence as you can give. In that situation, it definitely gave the defendants enough information to be able to respond. The court then ordered the defendants to respond with an affidavit, and they did not. So that's that situation.

They also cite *Hoffman v. Beer Drivers*. That says the court may, in a contempt proceeding, narrow the issues by requiring the affidavits be controverted by counter-affidavits and may thereafter treat as true facts that are uncontroverted. And *Peterson v. Highland Music* says the same thing.

So in terms of our obligation to submit an affidavit, we submit:

1. That, legally, we're not required to because there's not clear and convincing evidence, which I'll get to; but

2. For a lot of this, I'm not even sure we have enough information to be able to confirm or deny the vague allegations that they've made.

And I would further submit -- I take their point to say, "Well, then let" -- "the Court should require affidavits." But in the cases that have required it, there's been first clear and convincing evidence. And here, I think that it wouldn't be appropriate at least unless we get more details about what

they're alleging, and I'll get to that.

But I just wanted to briefly hit one other point, which I think is dispositive, which is the Ninth Circuit has said very clearly that you cannot have a contempt showing based on affidavits, that there needs to be live testimony, which I'm -- I take it that the plaintiff doesn't want to provide.

But in *Hoffman* -- this is their case that they cite, *Hoffman v. Beer Drivers*, out of the Ninth Circuit as well, 1976. The court says, at Page 1277, "We hold that a civil contempt proceeding, which may lead to the assessment of a fine, is a trial within the meaning of Rule 43(a), rather than a hearing on a motion within the meaning of Rule 43(e), and that the issues may not be tried on the basis of affidavits."

And Rule 43(a), as a refresher, says that, at trial, a witness's testimony must be taken in open court. So I don't know that these -- we have a lot of -- of disputed facts. And in the absence of live testimony, which would be very helpful to cross-examine, given the vagueness of the affidavit, the court is quite clear that there can't be a finding of contempt.

And they say the same thing in *Peterson v. Highland Music*, that you can use affidavits to narrow the issues, but you ordinarily still need live testimony.

**THE COURT:** Okay.

**MR. DWYER:** Unless Your Honor has questions, I'd like to address the -- the allegation of the 23 new WhatsApp

accounts.

**THE COURT:** Go ahead.

**MR. DWYER:** So the affidavit accuses NSO -- or I guess, you know, NSO employees of creating 23 new WhatsApp accounts post-injunction.

We said -- made the point very strongly in our opposition that they don't name these accounts. They don't say what phone numbers are associated with them, what names, what email addresses, literally nothing to identify what these 23 accounts are or who created them beyond someone who either works at or is, in some way, associated with our company.

I thought for sure they would come back and reply and say, "Okay. Here's the names of the accounts" or identify them in some way. They haven't done that.

So without telling us what accounts we're accused of creating, it's really hard to do an investigation, figure out, "Okay. Who" -- "did someone create these accounts? Who was it? Are they associated with us?" It is -- it is quite difficult for us to then somehow take on the burden of disproving an allegation that they won't specify.

And then they do the same thing when it comes to the evidence, that if you look -- you can look really hard at the affidavit and say, "Okay. What is the evidence? Why do they think these 23 unnamed accounts were created by NSO?" And they say that there are, quote, "technical and behavioral signatures

that we," Meta, "have, in the past, found are linked to NSO, and those same signatures are also in these 23 unnamed accounts."

We said, "Okay. What are the signatures?"

"We don't know."

"Why did you previously think these signatures were tied to NSO accounts?"

"We don't know."

So it is quite impossible for us to do an investigation and figure out whether these signatures are linked to NSO or whether they have got this right or wrong in some way without knowing what the signatures are.

So -- and then, again, the -- I think you just -- you just heard from -- Mr. Block say, "Well, yeah, we" -- "we didn't want them to know how we knew what they did. So we did a vague affidavit, and we were very curious to see what they would come back with." That is not clear and convincing evidence.

That's using a contempt motion as a means of discovery of, "We can submit a vague affidavit, and then you have to go do some sort of internal audit and explain to us what you're doing." Again, that's a burden-shifting that is just not in the case law.

Next, on the -- on the testing groups, we have a very similar problem, that they identify signals they say that are associated with these testing groups that they say are WhatsApp

testing group- -- or that are NSO testing groups and that they've seen these same signals in the past, and they're -- they link up with these new groups.

We don't know what the signals are. They don't tell us. They also don't tell us, "Okay. What WhatsApp account created these groups?" If we knew what WhatsApp account created those groups, maybe we can figure out whether it's someone associated with our company. They don't say.

They don't say who the members are of these groups. They don't even fully say the names of these groups. There's supposedly -- they say 20 or 34 groups. There are a few identified in Paragraph 11, but it's not even clear whether those are actual names or whether they're just giving examples of -- of naming conventions.

Their main evidence, as far as I can tell, that these groups are being used to test the functionality of spyware is just the name is "Test." But as they said, they don't know what is being discussed.

So as far as I understand it, it's more plausible that when you say a group is called "Test in Yemen," you're talking about tests that you're doing in Yemen, not tests that you're doing on WhatsApp. But, again, we haven't been given enough information to investigate this claim.

And then, finally, one of the WhatsApp groups, which they don't give us the name for -- they say that there was someone

who issued a report with a photo that had an NSO mouse pad in it, but we were not told what account sent that photo or were not given the actual report that was made. It would be helpful to know what information the person who submitted the report provided, if anything, beyond the photo.

And then finally, Your Honor -- well -- sorry -- not "finally" because I also want to address the new accounts point. But finally, on the allegation that there was texting of malicious URLs -- and this goes to Your Honor's question of what is done by NSO and what is done by customers -- they allege, Paragraph 13 of Mr. Blaich's affidavit, that an NSO customer used WhatsApp to deliver likely one-click malicious URLs to targeted individuals.

So it's very important to be clear on what they are alleging. They are alleging that an NSO customer sent these texts over WhatsApp. They're not alleging that NSO sent these texts over WhatsApp. It says, in Paragraph 13, very clearly the threat intelligence team assesses, with high confidence, that this activity was carried out by an NSO customer.

So the customer is texting over WhatsApp, and how is the customer delivering these URLs to individuals? Again, Paragraph 13, quote, "The customer used" -- the quote begins at "used" -- "used the WhatsApp platform to deliver likely one-click malicious URLs to targeted individuals."

So it's a customer texting URLs over WhatsApp. That is

the entire nexus of this hacking campaign, the entire nexus to WhatsApp. The only connection to WhatsApp is that a customer sends a URL over WhatsApp. Very important, they do not allege that Pegasus or any sort of spyware is being sent to targets through WhatsApp. They actually say the opposite on Page -- on Paragraph 14.

Mr. Blaich says that the attacker activity does not involve exploiting WhatsApp but, rather, involves sending a targeted user a malicious URL that links to a non-Meta third-party website that will attempt to cause malware to download and install on target devices if the recipient clicks the malicious URL.

So the nexus to WhatsApp is that it is the URL that was sent by the customer over WhatsApp, and if it's clicked, the phone then downloads spyware allegedly from a third-party non-Meta website.

Now, I guess Mr. Block said that our argument on why this doesn't violate the injunction is unclear. So I want to be very clear. Assuming that that is true, that all of those allegations are true, which we don't believe there's evidence of -- and I'll get to in a minute -- but assuming that's true, it still doesn't violate the injunction for two reasons.

And the first is, I think, they've admitted a URL, even a malicious URL, is not technology. And Section 3A of the permanent injunction prohibits NSO from developing or selling

technology that interacts with or emulates the WhatsApp platform.

Now, URLs are not technology, they concede at Page 10 of their reply brief. But what they say is that, "Well, it doesn't matter that the URLs are not technology because NSO is providing other technology, like they are providing Pegasus, which helps create the URLs, or they're providing this third-party server that allegedly" -- if someone clicks on a URL, that the server, not through WhatsApp, sends the -- Pegasus to the device. Those are all technologies, they say.

Sure, those are technologies. But, remember, the injunction only prohibits technologies that interact with or emulate WhatsApp, and these other things -- this third-party website, by their own admission, Paragraph 14, does not interact with WhatsApp in any way. It's a non-Meta website. So the only link is these texting of the URLs, and those are not technologies, and anything else does not interact with WhatsApp.

Second, and -- and perhaps more importantly, there is no evidence that the decision to text the URL via WhatsApp as opposed to via Signal or Telegram or Gmail or any other communication mechanism -- there's no evidence that that decision was anything other than an independent decision made by a sovereign government.

And that -- WhatsApp admits that it was an NSO customer,

not NSO, who texted this URL via WhatsApp. And WhatsApp doesn't allege that NSO somehow directed its customer to text their targets via WhatsApp as opposed to any other communication method.

And it's not even -- it wouldn't even be plausible that NSO would be able to control how its customers interact with their targets because it's very important that we're talking about zero-click technology here and -- or one- -- or sorry -- one-click but not zero-click; right?

Zero-click is things that were dealt with in the past of spyware being sent directly through WhatsApp to a target. One-click is kind of a classic phishing; right? One-click is where you -- essentially, the -- the customer, the intelligence agent who is doing this, is trying to trick the target into clicking on a malicious URL.

Like, we all get phishing emails in -- in the mail, but this is kind of a more sophisticated, targeted version of that. The nation-state intelligent [sic] agent, who is trying to trick one of their targets into clicking on a link, isn't going to trust that to a third-party private company like UR- -- like NSO Group. NSO Group would never want to be involved with it, and they wouldn't let us be involved with it.

That -- and what communication method the agent uses to try to trick the target to clicking on the link is going to be totally context-dependent; right? If they're chatting with a

suspected terrorist and they're talking on Signal, then they're probably going to send it via Signal. If they're talking over Gmail, they're probably going to send it over Gmail.

But this is a decision that is totally made by the nation-state customer, which is not subject to the injunction, and it's one that -- it would be very difficult for NSO to control, even if we wanted to, because we'd have to instruct our customers that, "When you're talking to your very sensitive targets, you can't use WhatsApp." And they would have to instruct their undercover agents not to do it that way. That -- it is really far removed from any decision that the company can make or has control over.

I know I'm going long. So I'll try to go short on this, but I think -- I could talk in more detail, if necessary, how there's not even very good evidence that the person who sent these messages over WhatsApp was an NSO customer. I could discuss that, but I'll -- for brevity, I'll skip that and come back only if necessary.

And then, finally, on the question of whether NSO is barred from, you know, using WhatsApp for sort of -- you know, what we would agree are innocuous like -- discussions like what we put in our -- our brief and talk- -- coordinating prayers and coordinating an emergency response and things of that nature, I'm not sure that that's what we were accused of. So I don't know that that was squarely presented.

But certainly, how I read the order is the same as Your Honor, which is that there is a provision in 3D that most directly deals with just the use of -- of WhatsApp accounts, and it bars NSO from creating accounts. Other parts talk about requiring NSO to delete code, to delete information. So there's no requirement that they delete existing WhatsApp accounts.

3D says they can't create accounts, which, at least to me, implies that they can use the ones they already have. The provision that Mr. Block reads as preventing the use of preexisting accounts is 3A, which prohibits developing, using, selling, or offering for sale, distributing, transferring, or licensing any technology that interacts with the WhatsApp platform.

So I guess the argument is that their -- their -- the technology that's interacting with the platform is the app itself or is the phone itself. It's -- it's quite -- kind of a convoluted way to get to what is a very simple thing, which is you can't use WhatsApp anymore, and you have to delete your WhatsApp accounts.

So that's certainly not how we would read it, and we would submit that it's pretty -- if that is the reading of it, it would be pretty overbroad and punitive to not allow WhatsApp for any purpose, particularly in a country like Israel, where 99 percent of adults use WhatsApp for all sorts of pers- -- of

purposes, both personal and professional.

So I think that's kind of a separate issue, but --

**THE COURT:** Well, how -- how do you reconcile that, though, with the position taken on appeal?

I haven't read the briefs on appeal, but Mr. Block quoted a portion of -- of the words presented to the Ninth Circuit, which were -- it seems pretty clear that you were taking the position that NSO was prohibited from using WhatsApp for all purposes.

**MR. DWYER:** So, Your Honor -- I mean, I think there's a lot of discussion about the precise interpretation of the injunction in the Ninth Circuit briefing.

The -- I think the main point is the -- whether we're barred from just use -- just using servers -- like, sending messages over WhatsApp servers versus collecting information from WhatsApp applications. And that is the main dispute in the Ninth Circuit that we say that -- extending it to WhatsApp applications is a bridge too far.

I -- there's a bunch of quotes in their brief, from our WhatsUp [sic] -- our Ninth Circuit response, that that was most of them. I take the point he says about using, but I would also say -- I mean, if you're going to sort of play that game, that they -- conversely, WhatsApp characterizes the injunction very narrowly before the Ninth Circuit, that they say, at Page 62 of their brief, that the order does not prohibit --

prohibit the development of surveillance technology generally. It simply bars NSO from accessing WhatsApp's protective systems, intercepting WhatsApp user communications, or collecting WhatsApp user data without authorization.

So, you know, you certainly have them characterizing the injunction narrowly on appeal and us characterizing it more broadly.

**THE COURT:** Hmm.

What's the status of the appeal?

**MR. BLOCK:** Fully briefed, Your Honor, awaiting to schedule with argument.

**THE COURT:** Okay. Uh-huh.

Okay. All right. It seems to me that both sides have characterized the Court's holding on the merits, on the issue of injunction, damages, anything, if you've characterized it, in the Ninth Circuit. And here, you're arguing today that -- that I should interpret it in the way in which you have construed it.

And if that's different than what's being argued before the Ninth Circuit, that really sort of puts me in a bind, doesn't it? Shouldn't we wait until the Ninth Circuit either affirms or reverses the ultimate finding in this case --

**MR. BLOCK:** If --

**THE COURT:** -- before me trying to clarify the use provision in the -- in the injunction order?

**MR. BLOCK:** If I may, Your Honor, no. The reason is they asked you -- or I -- I -- actually, I don't recall whether they asked Your Honor, but they certainly asked the Ninth Circuit to stay the injunction pending appeal. And that request was rightly denied --

**THE COURT:** Uh-huh.

**MR. BLOCK:** -- based on all the factors.

So to wait for -- to -- to now effectively grant them that stay, which is what you would be doing, by waiting for the Ninth Circuit to pass on what it says, would be -- a reversal of that decision, which would be unjust for all the reasons that it wasn't right to grant it in the first place.

So plaintiffs made a showing of irreparable harm absent the injunction. NSO had its opportunity to say, "Let's put it on pause, we have a fight about whether Judge Hamilton got any of this right at all." And we asked for the injunction to proceed, and we prevailed, and so there is no reason to revisit that.

Second, there is not a, "Oh, he said/she said. We said it was narrow. They said it was broad." Mr. Dwyer characterized our characterization of a particular clause, but he is not quoting to you language where we said the injunction, writ large, does not prohibit use. It certainly does prohibit the things that Mr. Dwyer says, and he's right. It does not prohibit the use of Signal. It prohibits the use of WhatsApp,

and that's the simple point that he quoted from us.

By contrast, when we were arguing before Your Honor, before the injunction went into place, NSO complained, "This is a problem" -- this is Docket 759-2, at 14. "This is a problem because," as they understood it, "it would prohibit NSO employees from using WhatsApp for internal communications," closed quote.

Your Honor issued the injunction, notwithstanding that objection. And then they turned around on appeal, as we've said, and said, "This is a problem. You should stay it because it enjoins us from using WhatsApp."

That's exactly what it does, and I concede that that is broad. In fact, I embrace it, Your Honor. It's appropriately broad when you think about the nature of the conduct in this case and the way that this particular actor used WhatsApp.

So Counsel has spoken about how, in Israel, 99 percent of people there are using the platform. 99.999 percent of them are not using it to hack into WhatsApp servers and conduct the conduct that was proven at trial, which gave rise to an extraordinary punitive damages verdict, which Your Honor then addressed on remittitur.

So that's as to innocuous use. I can walk back through --

**MR. DWYER:** Your Honor, can I -- can I be heard on the question of whether you should wait for the Ninth Circuit?

**THE COURT:** Yeah. Yeah.

I'll give you a chance, Mr. Block, to respond once he's finished with his opposition.

**MR. DWYER:** Your Honor, I think that would be extremely prudent. I mean, this dispute about just the mere use of preexisting accounts is really pretty peripheral to the motion that they made.

The main point of their motion, which would really affect the ongoing Ninth Circuit litigation, is their allegation that just the mere independent decision by an NSO customer, a sovereign government, to choose to text one of their intelligence targets via WhatsApp as opposed to Signal or anything else -- that if the -- if you read the injunction to embrace -- to cover that, that would absolutely broaden it beyond what we or anyone else has said it covers to the Ninth Circuit.

And we would have to do kind of a supplemental briefing to tell the -- I mean, we would have to address that to say, "Well, we think it's" -- you know, "It's now being confirmed to be even broader than we thought it was."

So I think the prudent thing would be to get the ruling from the Ninth Circuit on whether what currently exists is something that would be upheld before we get into, you know, whether the order should be broadened the way that WhatsApp wants to broaden it.

I mean, that's what's really raising the sort of legal and

policy issues, is extending it to this independent decision by foreign governments.

**THE COURT:** Hmm.

Okay. Are you otherwise finished, Mr. Dwyer, with your presentation?

**MR. DWYER:** Yes, Your Honor, unless you have questions.

**THE COURT:** Okay. Mr. Block, you get --

**MR. BLOCK:** Thank you.

**THE COURT:** -- the last word on this motion.

**MR. BLOCK:** I appreciate it, and I will -- I will be as brief as I can.

Let me start where Mr. Dwyer finished. The evidence in this case is that the software NSO operates -- they do all of the operation. At most -- this is at Page 9 of the reply, the quotes, et cetera. At most, the customer puts in a phone number.

There was testimony that maybe the customer elects whether to do it zero-click or one-click, but everything, all of the sending of the installation vectors -- that is all for NSO to take care of, not for the customer. That was the evidence.

Now, if they're doing something different and they want to come and say, "Your Honor, is it okay if we proceed now in this different way?", sure, let's have that conversation. But there is nothing about that, and they want to now have a factual

fight.

And so, put differently, Mr. Dwyer's entire argument assumes the truth of what he has said to you without evidence, which is that this is just some third party. Well, what we're talking about is a URL, which is highly sophisticated, designed by NSO to hide where it is directing the user so that, when they click on it, it goes to download the software.

So that is a -- a serious problem. It is absolutely enjoined. If NSO is still providing to anyone -- it's NSO who's enjoined, not their customers -- a set of infrastructure that delivers installation vectors over WhatsApp, that is barred because they've forfeited the right to use WhatsApp when -- by abusing it. And that's plain in your injunction.

There was a statement that we concede URLs are not technology. I frankly think that's a sideshow because there's no question that what NSO was doing is offering a very sophisticated technology that interacts with WhatsApp's platform.

However, one need only Google "URLs," "technology," and "Tim Berners-Lee." URLs are frequently described as one of the three building-block technologies, one of the three fundamental technologies of the World Wide Web. A uniform resource locator is a piece of technology.

Again, we don't need that because it's a -- a pretty funny way to look at the question, whether the URL itself is

technology versus NSO providing infrastructure that interacts with WhatsApp to conduct their business, but I wanted to address that one point.

I think I've addressed this. Mr. Dwyer says it's just the customers that do it. That was not the evidence at trial. The evidence at trial was that NSO was deeply involved. And, in fact, we've litigated that issue.

Whether they were responsible for this or whether they can just hide behind some third party who hasn't shown up hasn't been evidenced. They cannot. Your Honor has decided that a bunch of times.

**THE COURT:** Their position -- position was in the context of the zero-click technology, Pegasus -- that's represented by the Pegasus app, not the --

**MR. BLOCK:** Let me --

**THE COURT:** -- one-click URL --

**MR. BLOCK:** And so --

**THE COURT:** -- which I -- I look at those two things as different.

**MR. BLOCK:** Well, Your Honor, it was in the context of a zero-click installation vector for Pegasus. So we're talking about two different ways to get Pegasus, which is the technology that goes on your mobile phone.

**THE COURT:** Right.

**MR. BLOCK:** How do you get it onto the mobile phone?

And they had one zero-click way of doing that, and they had another one-click way of doing that.

And the fight we had, at injunction time, is should your injunction be restricted only to the zero-click vector that we were able to discover, despite all of their efforts to keep it secret, or, as a result of their conduct, their making it their business to hide from victims like WhatsApp, must the injunction reach broader to be therapeutic and prevent the kind of harm that they caused to WhatsApp in this case?

And Your Honor rightly decided that the injunction does not just say, "You got caught, in 2019, doing one thing. Please don't do it again." Instead, it says, "You have broken the laws of the United States, and we need to issue relief sufficient to ensure that your victims in the United States, WhatsApp, are protected from similar misconduct in the future." That's exactly what Your Honor did.

And so the evidence at trial about the interaction between NSO and its customers -- by the time of trial, they were saying, "We're not doing that zero-click anymore. You found it and shut it down," even though they had repeatedly and repeatedly and, for all we know, are still developing or implementing new installation vectors that use WhatsApp that we haven't even found. We just don't know.

But even at that time at trial, they were employing both the zero-click and the one-click installation vectors both

through the NSO technology that they would create and install and provide a technical support center for. And the testimony, the evidence at trial, was a customer just puts in a phone number.

Now, that reaches Pegasus, its installation vectors. It's not just the zero-click. It's also the one-click. Again, if there's some other way it's happening, there's just no evidence that they took steps to comply by doing X, which would enable you to say, "Yep, that's not a problem. It's not a violation of my injunction."

That leads me to my next point, Your Honor, which is this is all conduct within their ken and their knowledge. So they say, "How were we supposed to respond to Mr. Blaich's declaration unless he tells us every single tool that anybody has to find out the surreptitious things that we're doing?"

It would be very, very easy for NSO to answer the question: Is Pegasus still collecting WhatsApp quest- -- messages from the phone? Is Pegasus still using WhatsApp for installation vectors? Is NSO still using WhatsApp for its communications to support its business? Is WhatsApp creating new accounts?

They don't need the evidence we found in order to answer that question. And it is extremely telling that, in response to that evidence, they did not even deny it, let alone come up with evidence of their own. Still, they do not deny it. You

have not heard Mr. Dwyer say this conduct is not happening, even an attorney say-so without a declaration or documentary evidence to support it.

And so the law cannot be that a contemnor who is able to act in secret is immune from sanction unless and until, independent of any discovery or burden at all, the victim is able to prove on their own without -- not even, you know, subject to addressing rebuttal evidence at some level of proof they've described.

And so I would submit to Your Honor, Mr. Blaich's declaration describes his qualifications, his background, the way he conducts his analysis. And it is clear and convincing, particularly given that it is uncontroverted.

**THE COURT:** Hmm.

**MR. BLOCK:** We think that's plenty sufficient to issue a finding of contempt now, and we offered a proposed order. In the alternative, if Your Honor is not convinced, the correct next step is an order to show cause, initiate contempt proceedings. Let's find out what they're doing.

They should be subject to discovery. They should explain, "What are the steps you took to comply with the injunction? How is Pegasus different today from the day before this Court ordered an injunction and ordered you to comply with it?" That is the only way for us to find out the rest of it.

Now, again, we have clear and convincing evidence of some

very narrow things. We know that they are using WhatsApp, including for business purposes. Mr. Dwyer's own surmise is that "Tests in Yemen" might be tests on Yemen or tests located in Yemen. These are NSO discussions about what tests. I mean, there's no -- this is just, you know -- I don't know -- high school kids' exams. Nobody's making that kind of a ridiculous guess. This is WhatsApp communications.

And he said they're upset because WhatsApp shut down other groups that may be used for travel discounts. The reason your injunction was written the way it was, after all of those objections, is that Your Honor does not need to be here saying, "Which use was that? Was that sufficiently business-related, or did that feel personal? If, halfway through the thread, somebody had a birthday party they were discussing, is it enjoined or not?"

This was very simple. They engaged in egregious misconduct, and as a result, they forfeited their right to use WhatsApp the way other people who don't engage in that conduct do.

I'm sure there was something else Mr. Dwyer said that I disagree with. I would just refer you to my papers, Your Honor. If you have a question, I'm very happy to answer it.

**THE COURT:** Well, he just -- he did challenge your interpretation of the burden-shifting and --

**MR. BLOCK:** Yeah.

**THE COURT:** -- and the sufficiency of an affidavit to establish clear and convincing evidence.

Do you want to respond?

**MR. BLOCK:** I -- yes. Thank you, Your Honor.

And I would just refer you to the *Peterson* case, which is 1998, as a starting point. Now, we go into it in more detail in the briefs, but that case stands for the very clear proposition at the Ninth Circuit that you do not need an evidentiary hearing.

If Your Honor wants to hold one, we can talk about the appropriate guardrails and how we can have evidence from NSO at that hearing, but you don't need one when what you have is uncontroverted affidavits.

And so they had an opportunity to come in opposition to our motion for contempt. They could have said, "Here's our evidence." They could have said, "We need a chance to bring evidence." They could have said, "We need a hearing in which we can present evidence."

All they said, without even purporting to deny the contents of Mr. Blaich's declaration, was that his declaration was not enough. We disagree with them about that for the reasons I've explained, but it's plainly enough to initiate contempt proceedings. And, again, it really is plenty, in this context, to issue a finding of contempt.

If Your Honor wants to talk about what the contempt proceedings would look like, we can submit a proposed order, which we think would advance that ball, if it would be helpful.

**THE COURT:** Uh-huh.

Yeah, I think it would be.

**MR. BLOCK:** Okay. We'd be happy to do that, Your Honor.

**THE COURT:** Okay. Let's -- you've given me, you know, I think, some -- some good arguments on both sides. I appreciate that, but let's move to the discovery issue.

Let me just tell you, I don't really like getting lots of different letters. We have a procedure whereby, if we can resolve a discovery dispute by a jointly filed letter brief, we do that. If we can't do it, I -- it does not help me to receive individual letters. So I'd like you to stop.

If the proceeding can't be resolved in a letter brief, I'd ask for full briefing on it. But I didn't really get much of a chance, given that I got a July 31st letter, then a follow-up in August, and then a response, and then -- I'm not exactly sure where we stand. There is some meeting-and-conferring going on. I don't know where we stand.

So, if you would, I'd like one of you to describe the status. Now, from the last thing that was filed -- let's see -- it appears that there are really only three issues that are in dispute: having --

**MR. MARZORATI:** That's right, Your Honor.

**THE COURT:** -- the credit and loan agreements and the payments and distributions to officers and equity holders and the valuations and asset identification.

Is it correct that those are the only three issues about which you cannot reach agreement?

**MR. DWYER:** Your Honor --

**MR. MARZORATI:** That's right, Your Honor.

**MR. DWYER:** -- if I may, before we -- sorry. I hate to interrupt, but before we get into this -- so I -- there is another law firm that is representing NSO Group with respect to the Rule 69 post-judgment financial enforcement. I was not -- I understood this hearing was noticed for the contempt hearing, and I don't believe Mr. Perla is on.

So I'm certainly happy to -- to take notes and report back, but I'm going to be pretty limited in my ability to -- I haven't been a part of the meet-and-confers with WhatsApp as it relates to the financial discovery. So I just wanted to kind of --

**THE COURT:** Okay.

**MR. DWYER:** Yeah.

**THE COURT:** I just wanted to take the opportunity, since I thought everyone was online, to try to resolve this.

But, Mr. Marzorati, you can confirm that, at least from the plaintiffs' perspective, there are these three issues

remaining; is that correct?

**MR. MARZORATI:** That's correct.

And just to situate you on where we're at in post-judgment discovery, we have a judgment for over $20 million. NSO has not paid a cent. What we're trying to do is find out where the money is, who has claims on it, and whether it's been moving around in the period around the judgment. And that's really what post-judgment discovery is for.

So you're right. It is three categories. There is the credit and loan agreements, there is documents related to the transfers, and the final category is valuation documents. And these are really within the core of what Rule 69 requires.

Credit and loan agreements -- that's the most important to us, and that's the one I'll start with, just quickly. These are in --

**THE COURT:** Well -- well, wait a minute.

I don't know that it's fair, if the defense isn't represented, to go into the substance. I'm just trying to figure out the best way to re- -- ultimately resolve the dispute as simply as -- as possible.

So there are these three categories, and as I understand it from the briefing -- that NSO wants to perhaps file a motion for a protective order on these three issues.

Am I correct in that?

**MR. MARZORATI:** Your Honor, I can't speak for NSO, but

what I will say is we did our best to present Your Honor with a joint discovery letter. This is after months of meeting and conferring.

Only after that joint discovery was -- letter was filed did NSO file an individual letter to you, which we understand is not contemplated by the Court's rules. It said, "We're going to essentially walk back from certain of our positions." They didn't share that with us before they filed it with you.

Our response was only to say, "Look, there are these three categories outstanding." We think it's -- there's a clear dispute. They won't produce them. We want them. And for all the reasons put forward in our joint discovery letter, we think they're appropriate under Rule 69.

**THE COURT:** Okay. So they did respond to -- or provide their responses or objections to those three categories in the joint letter?

**MR. MARZORATI:** Yes, Your Honor.

We -- we have been -- we're past the -- the responses and objections were served way back in May. We've been negotiating for many months over these categories of documents. We've been able to reach some compromises as to what they're willing to produce.

But as to these three categories, the record is very clear. We think we're entitled to them under Rule 69. They say, "You're not entitled to them." It's a ripe dispute, and

we think you should order production of them.

**THE COURT:** Okay. Okay. What I'd like to do, then, is to order one last meet-and-confer on these three issues alone.

And I'll just indicate that, in my view, this is not third-party discovery. You're -- as I'm -- as I understand it, you're seeking information only from NSO within NSO's custody when they're -- within their possession and custody.

And it doesn't seem to me that you need to get the information from a third party, even if it involves a third party. If NSO's party to a particular loan agreement or credit agreement, they can provide the information without the third party.

**MR. MARZORATI:** That's exactly our position, Your Honor. It's documents -- these are agreements that NSO has entered into. These are documents showing transfers from NSO, de facto date, or with another party, or the transfers go to another party.

In our view, that doesn't make it nonparty discovery, which is basically the argument that NSO is making. And all their cases are basically aimed at that proposition, which we think is a strawman here.

**THE COURT:** Would the -- my only concern would be, if the other party was one of their government customers who have not been -- whose identity has not been ordered, couldn't you

cure any problem with a simple redaction of the name?

**MR. MARZORATI:** Yes, and that's not something that NSO has raised with us.

They've -- again, we've been meeting and conferring. You know, they have raised objections for over three months now. This government privacy issue is not something they've raised with us. We're really seeking -- many of the credit and loan agreements are with other members of the kind of NSO corporate structure.

So we're happy to address it. If they do raise an issue related to the sensitivity of their customers, happy to address that, but that's not really one of the issues that we've conferred.

**THE COURT:** Okay.

**MR. MARZORATI:** And the credit and loan agreements, of course, are with other private entities.

**THE COURT:** Okay.

**MR. DWYER:** Could I --

**THE COURT:** Yes.

**MR. DWYER:** Your Honor, just briefly, I don't really have the ability to respond, unfortunately, on the merits of it. I would just ask Your Honor to keep an open mind until we're able to -- to address this by the attorneys that -- that are read in.

**THE COURT:** Sure, but I'm trying to give you some

guidance that will help advance the dispute as efficiently as possible.

So what I'd like, then, is another meet-and-confer within the next two weeks, and then I'd like a status -- a jointly filed status statement.

And you can decide, among -- among yourselves, whether or not -- if you're unable to resolve it, whether or not a motion for a protective order from the defendant is more appropriate than a motion for an order compelling production from the plaintiff --

**MR. MARZORATI:** Understood, Your Honor.

Thank you, Your Honor.

**THE COURT:** -- one of the two.

All right. So then put it before me in a formal motion, which I'll hear on the papers. I won't -- unless I have questions, I won't probably have a hearing on it.

Okay. Within the next two weeks, the meet-and-confer; and within a week thereafter, the status statement.

**MR. MARZORATI:** Will do, Your Honor.

**THE COURT:** Okay.

**MR. DWYER:** Thank you, Your Honor.

**THE COURT:** All right.

**MR. BLOCK:** Your Honor -- sorry. Maybe you were about to address it, but I just wanted to make sure I understand the next steps on contempt. I'm happy to pose the question.

**THE COURT:** Well, I would like some time to think about the arguments that you've made today, and I'd like to see any proposal that you want to make about re- -- resolving this.

Can you get something in in the next week or two?

**MR. BLOCK:** With respect to contempt, I'm -- I'm not optimistic of a proposed resolution, although we're -- we remain and continue to be happy to talk to the other side.

But a proposed -- and I had suggested -- what I intend to suggest, Your Honor, was an alternative proposed order -- and we can certainly get that in within a week -- which would be, if Your Honor's -- in the event that Your Honor is not prepared to find contempt on the papers, which we continue to submit is the right outcome, we can offer a proposed order that we think would be a path forward towards additional proceedings.

**THE COURT:** Okay.

**MR. DWYER:** Well, I guess we would just say, Your Honor -- I mean, first, we think there quite clearly can't be contempt at this point when there's been no live testimony, which is required.

But secondly, you know, to the extent that Your Honor was going to order a response from NSO, I think we would first need to get a more detailed affidavit or charges from WhatsApp so that we would have the ability to give an intelligent response. I think we're -- we're pretty far away from that at this point.

**THE COURT:** Hmm.

Well, I think it's going to depend upon our interpretation of the *Peterson* and the *Hoffman* cases.

**MR. DWYER:** Yes.

**THE COURT:** I think you both are citing different cases for your different perspectives on what is required here. So I think I need to take a deeper dive into those cases and try to figure out the appropriate process.

But it would be helpful to have whatever your proposal is going to be, Mr. Block, so that I can have that in mind as I'm figuring out what the next steps will be.

**MR. BLOCK:** Thank you, Your Honor.

We'll get that on file within, say, a week. Would that be acceptable?

**THE COURT:** That's acceptable. Thank you.

**MR. BLOCK:** Thank you.

**MR. DWYER:** And will we be able to submit a response after they submit theirs?

**THE COURT:** Sure.

How about a week after that?

**MR. DWYER:** That sounds good.

Thank you, Your Honor.

**THE COURT:** Okay. Okay. Anything else?

All right. Then the matter is submitted. Thank you.

**MR. ANDRES:** Nice to see you, Judge.

**MR. BLOCK:** Thank you, Your Honor.

**MR. DWYER:** Thank you, Your Honor. It was nice to meet you.

(Proceedings adjourned at 2:50 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Saturday, August 22, 2026

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter